

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-25-1995

# Fisher Bros v USA

Precedential or Non-Precedential:

Docket 93-1182

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation
"Fisher Bros v USA" (1995). *1995 Decisions.* Paper 22.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/22

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


Nos. 93-1182; 93-1205; 93-1206;
93-1207; 93-1208; 93-1209


FISHER BROS. SALES, INC.

Appellant in 93-1182.

v.

UNITED STATES OF AMERICA


JULIA SAAVEDRA BALMACEDA; AANDRES MUNOZ TORRES;
ABALOS LABBE JUAN PABLO; ABATTE OSORIO HONS.;
ABDON M. ALVAREZ; ABRAHAM SABAJ NALLAR;
ABRIGO OLIVOS RODEMIL; ACEVEDO DURAN OSVALDO HERNAN;
ACOSTA RAMIREZ CARLOS; VICTORIANO ACUNA CONTRERAS;
MARCO HERIBETO ACUNA MONTERO; JAVIER ACUNA GONZALEZ;
MARDONES ADOLFO RIVEROS; ADRIANA RODRIGUEZ LARRAGANA;
AGR HENRIQUEZ Y VARELA; AGR KIWI MASTERS LTDA;
AGRIC MORANDE LAVIN LTDA; AGRIC CAIQUENES LTDA;
AGRIC CARVALLO LTDA; AGRIC CERRILLO LTDA; AGRIC CHOROMBO LTDA;
AGRIC COTIELLA LTDA; AGRIC DEL ALTO LTDA; AGRIC DEL VALLE
LTDA; AGRIC EL ESPINO N12, et al.

Appellants in 93-1205,

v.

UNITED STATES OF AMERICA


CARBEN, INC.,

Appellant in 93-1206

v.

UNITED STATES OF AMERICA

COMPANIA SUD AMERICANA DE VAPORES S.A.,

Appellant in 93-1207.

v.

UNITED STATES OF AMERICA


NEW MARKET INVESTMENT CORPORATION,

Appellant in 93-1208.

v.

UNITED STATES OF AMERICA


GUZMAN Y DEL REAL, LIMITRADA,
individually and as class representative,

v.

UNITED STATES OF AMERICA,

Guzman Y Del Real, Limitrada,

Appellant in 93-1209

.


On Appeal From the United States District Court
For the Eastern District of Pennsylvania
(D.C. Civil Action Nos. 92-02818; 92-00907;
92-01204; 92-01208; 92-01279; 92-04057)


Argued:  September 23, 1993

Before: STAPLETON, ROTH and LEWIS, Circuit Judges

Reargued in banc October 18, 1994
Before: SLOVITER, Chief Judge, BECKER, STAPLETON
MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, COWEN,
NYGAARD, ALITO, ROTH, LEWIS and McKEE, Circuit Judges

(Opinion Filed  January 25, l995  )

Christopher H. Mansuy, Esquire
Walker & Corsa
96 Hudson Street
Hoboken, NJ 07030
        Attorney for Appellant in 93-1182


Edward W. Madeira, Jr., Esquire
Robert L. Hickok, Esquire (Argued)
Matthew H. Adler, Esquire
Michael A. Ceramella, Esquire
Pepper, Hamilton & Scheetz
3000 Two Logan Square
Philadelphia, PA 19103-2799
        Attorneys for Appellants in 93-1205; 93-1206;
                        93-1207; 93-1208; and 93-1209


Stuart E. Schiffer,
Acting Assistant Attorney General
Michael J. Rotko
United States Attorney
Robert S. Greenspan, Esquire
Thomas M. Bondy, Esquire (Argued)
United States Department of Justice
Civil Division, Appellate Staff
Tenth and Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001

Phyllis J. Pyles, Esquire
United States Department of Justice
Torts Branch, Civil Division
P. O. Box 888
Ben Franklin Station
Washington, D.C.20044
        Attorneys for Appellees

OPINION OF THE COURT

STAPLETON, Circuit Judge:

The Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-2680, waives the federal government's sovereign immunity with respect to tort claims for money damages. The "discretionary function exception" to the FTCA limits that waiver, stating that the government retains sovereign immunity with respect to "[a]ny claim . . . based upon the exercise or performance [of,] or the failure to exercise or perform[,] a discretionary function or duty . . . , whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). The appeals now before the court in banc require us to examine the scope of the discretionary function exception.

The plaintiffs in these cases were injured by several policy decisions made by the Commissioner of the Food and Drug Administration ("FDA") while exercising a discretionary function. They seek to avoid the legal consequences that would flow from application of the discretionary function exception to their cases by (1) looking behind the Commissioner's injury-causing decision, (2) finding fault with an aspect of the data upon which it may have been based, and (3) arguing that their claims are not "based upon" the Commissioner's decisions but instead are "based upon" the alleged negligence of various laboratory technicians who supplied the allegedly faulty data to the Commissioner. We

reject this attempt to circumvent the discretionary function exception, concluding that if the discretionary function exception to the FTCA is to fulfill its clear and important purpose, a claim must be "based upon" the exercise of a discretionary function whenever the immediate cause of the plaintiff's injury is a decision which is susceptible of policy analysis and which is made by an official legally authorized to make it.  Because the plaintiffs' claims are based upon decisions susceptible of policy analysis and made by an official of the executive branch acting within his authority, we will affirm the district court's order dismissing these cases for lack of subject-matter jurisdiction.

For the purpose of our analysis, we have assumed the facts alleged by the plaintiffs to be true.  Berkovitz v. United States, 486 U.S. 531, 540 (1988).  Our "scope of review of the applicability of the discretionary function exception is plenary."  United States Fidelity & Guar. Co. v. United States, 837 F.2d 116, 119 (3d Cir.), cert. denied, 487 U.S. 1235 (1988).


I.

On March 2, 1989, an anonymous caller to the United States Embassy in Santiago, Chile, stated that Chilean fruit bound for the United States would be injected with cyanide.  The FDA took the lead agency role in evaluating the seriousness of the call, and it detained all incoming Chilean fruit over the weekend of March 4 and 5 while it undertook an investigation.  On March 6, having found no evidence that any Chilean fruit had

actually been poisoned, the FDA announced that it considered the call a hoax.  It nevertheless continued to conduct experiments concerning the effects that cyanide injections would have on various Chilean fruits.

The embassy in Santiago then received a second anonymous call.  This time the warnings were more specific.  The caller indicated that he had access to orchards, storage facilities, and shipping locations in Chile, and stated that unidentified fruit had already been injected with cyanide.  This prompted the FDA's Philadelphia District Office to double the inspection level of incoming Chilean fruit, beginning with that arriving on the "Almeria Star."  The Philadelphia District Office designated that certain portions of the Almeria Star's cargo would be examined, and any fruit that looked "suspect" was to be sent to the Philadelphia District Office for testing.

The increased level of inspection soon yielded results.  On the morning of March 12, an FDA inspector discovered two grapes from the Almeria Star which appeared to have been punctured, and which displayed uniform white rings.  Further examination of the crate containing these suspect grapes revealed a third white-ringed grape, which, unlike the others, appeared to have been slit rather than punctured.  Although the physical appearance of these grapes was inconsistent with that of grapes injected with cyanide during FDA experimentation, the FDA officials as a precautionary measure sent the grapes, as well as the crate in which they were packaged, to the FDA's Philadelphia laboratory for testing.

The Philadelphia laboratory began testing the grapes for cyanide in the early afternoon of March 12. The FDA technicians used all of the two punctured grapes in conducting their tests, but saved the third, slit, grape for confirmation purposes. The testing process required the grapes to be mashed until they turned into a solution. Sulfuric acid was then added to this slurry, causing a chemical reaction that released in gaseous form any cyanide that was present in the solution. The gas released from the solution was twice exposed to cyanide-sensitive strips of reactive paper, both of which indicated the presence of cyanide. A third test then confirmed a high concentration of cyanide present in the slurry. At approximately 9:30 p.m. on March 12, the Philadelphia laboratory orally reported positive cyanide test results from the solution to the FDA's Emergency Operations Center.

Meanwhile, FDA officials transferred a portion of the slurry, along with the third, slit, grape and the bunch in which these grapes had been found, to the FDA's Cincinnati laboratory. Technicians there identified two additional white-ringed grapes on the bunch, but were unable to confirm the presence of cyanide. The Philadelphia laboratory also continued testing other grapes from the suspect crate, as well as all packing materials in that crate. These further tests also failed to reveal the presence of cyanide.

The Commissioner was supplied with the findings of the Philadelphia and Cincinnati laboratories in the early morning hours of March 13. The information before him at that point was

that three tests conducted on two of the suspect grapes indicated the presence of cyanide. The retesting of the slurry and the testing of the third "reserved" grape, the other grapes, and the packaging, however, did not confirm the presence of cyanide. He also knew of the reports to the embassy in Santiago and the surveillance activity that had already been conducted. On the basis of this information, the Commissioner on March 13 issued an order refusing entry of any additional Chilean fruit into the United States and requiring the withdrawal and destruction of all Chilean fruit then in domestic channels of distribution. The FDA also issued a press release publicizing the Philadelphia laboratory's finding of cyanide in two Chilean grapes and the order refusing the entry of Chilean fruit into the United States. Consumers were encouraged to destroy any Chilean fruit in their possession, and grocers were instructed to remove all Chilean fruit from their shelves.

The plaintiffs in these cases are (1) approximately 2400 Chilean growers and exporters of fresh fruit, (2) a Chilean shipping line, (3) three United States firms that are engaged in the importation and distribution of fresh produce, and (4) a non-certified class whose named plaintiff is a Chilean fruit grower. They seek damages from the United States government under the FTCA, 28 U.S.C. § 1346(b), on a negligence theory, contending that the technicians in the FDA's Philadelphia laboratory were negligent in failing to reserve any portion of the two punctured grapes for later confirmation testing. Plaintiffs claim that this violated both the FDA's Regulatory Procedures Manual and

good laboratory practices generally.  As a result, the Cincinnati laboratory was unable to verify the positive result reported by the Philadelphia laboratory.  Plaintiffs further allege that the lab technicians were negligent in failing to record their observations contemporaneously with their testing, thereby casting doubt on the accuracy of their results and the content of the oral report, and in failing to take account of the known properties of cyanide in fruit.  According to the complaint, but for this negligence, the Commissioner would not have issued his orders and the Chilean fruit business for the spring season of 1989 would not have been destroyed.

The United States moved to dismiss, arguing that the district court lacked subject-matter jurisdiction over plaintiffs' claims.  The district court granted that motion, reasoning that the discretionary function exception to the FTCA shielded the government's conduct from liability.  The plaintiffs appeal.

## II.

### A.

The Federal Tort Claims Act gives district courts jurisdiction over:

> civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be

liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b).  The FTCA thus waives the government's sovereign immunity with respect to tort claims against the United States for money damages.

This waiver of the government's immunity is subject to certain exceptions, however, one of which is the discretionary function exception.  28 U.S.C. § 2680(a).  As we have noted, that exception dictates that the waiver "shall not apply to . . . [a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."

The discretionary function exception is designed to protect policy making by the politically accountable branches of government from interference in the form of "second-guessing" by the judiciary -- second guessing the result of which burdens the public fisc and the prospect of which skews the decisionmaking process of executive and legislative policymakers.  United States v. S.A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 808 (1984).  As the Court explained in Varig Airlines:

> [W]hatever else the discretionary function exception may include, it plainly was intended to encompass the discretionary acts of the Government acting in its role as a regulator of the conduct of private individuals.  Time and again the legislative history refers to the acts of regulatory agencies as examples of those covered by the exception . . . .  This emphasis upon

> protection for regulatory activities suggests an underlying basis for the inclusion of an exception for discretionary functions in the Act: Congress wished to prevent judicial "second-guessing" of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.

Id. at 814 (footnote omitted). Thus, the discretionary function exception is a product of Congress' recognition that "the imposition of liability for damages occasioned by governmental policymaking would necessarily involve a very substantial, if not prohibitive, social cost not only in terms of the imposed liability itself, but also in terms of the constraining effect of that liability on the decisions of governmental policymakers." Sea-Land Serv., Inc. v. United States, 919 F.2d 888, 890 (3d Cir. 1990), cert. denied, 500 U.S. 941 (1991).

Whether the discretionary function exception applies involves a two-pronged inquiry. "[A] court must first consider whether the action is a matter of choice for the acting employee." Berkovitz, 486 U.S. at 536. Second, the court must determine whether the element of judgment involved "is of the kind that the discretionary function exception was designed to shield." Id. Under this second prong, the court must determine whether the challenged discretionary actions or decisions were "based on considerations of public policy." Id. at 537. "The focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are

susceptible to policy analysis."  United States v. Gaubert, 499

U.S. 315, 325 (1991).


                              B.

        The district court, applying these principles to the

Commissioner's decisions to deny entry of Chilean fruit and to

destroy Chilean fruit already in the United States, found that

the decisions were policy decisions protected by the

discretionary function exception to the FTCA.  We agree.

Specifically, the district court concluded:

> The FDA acted to protect the public from the
> risk of exposure to poisonous fruit which it
> learned could be coming from Chile.  It had
> the discretion to test the fruit and
> determine whether the fruit was adulterated.
> It also had the discretion to refuse entry
> into the United States.  The actions taken
> were not violative of any regulatory or
> statutory provisions.  The acts taken were in
> accordance with the FDA's authority to
> determine whether or not a specific product
> should be allowed entrance into the United
> States.  This conduct is grounded in the
> policy of protecting the public health.  The
> actions were clearly in furtherance of the
> FDA's statutory mission to protect the
> American public from adulterated food.  All
> the acts involved judgment and choice and
> were grounded in policy.

Balmaceda v. United States, 815 F. Supp. 823, 827 (E.D. Pa.

1992).

        As the district court found, the Commissioner's

decisions were clearly "matter[s] of choice" for a person

occupying his position.  As the plaintiffs readily concede, the

orders giving rise to these cases were authorized both in the

sense that the Commissioner was acting within the scope of his authority[1] and in the sense that his orders were not in conflict with any applicable statute or regulation. In short, the Commissioner was the public official responsible for making these choices and he made them in a lawful manner. Accordingly, we turn to the second prong of a discretionary function exception analysis and consider whether the choices to be made were susceptible to policy analysis.

In making his decisions, the Commissioner was required to evaluate and reconcile in some manner the findings of the Philadelphia and Cincinnati laboratories. Among other things, this would include making a judgment about the significance of the fact that no segment of the first two grapes had been reserved for confirmatory testing. Moreover, the significance of this data had to be judged in the overall context of the reports to the embassy in Santiago, the surveillance activity that had

---

[1]. The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301–394, provides that the Commissioner of the FDA may "cause to be disseminated information regarding food, drugs, devices, or cosmetics in situations involving, in the opinion of the [Commissioner], imminent danger to the health or gross deception of the consumer." 21 U.S.C. § 375(b); see also 21 C.F.R. § 2.5(a). FDA regulations also permit the Commissioner of the FDA to initiate a "recall" of food in distribution channels where the food presents a risk of injury to consumers and recall is needed to protect the public health. 21 C.F.R. § 7.45; see 21 C.F.R. §§ 7.40–7.59. Whether and when to initiate a recall in any particular case is a judgment call for appropriate FDA officials to make in light of the perceived "urgen[cy]" of the situation. 21 C.F.R. § 7.40(b). Thus, whether recall is warranted is assessed in light of "the degree of seriousness of the health hazard" and "the likelihood of occurrence of the hazard." 21 C.F.R. § 7.41(a)(4),(5).

already been conducted, the probability that contaminated grapes, if they existed, would be consumed, and probable consequences of any such consumption to the person poisoned, fruit consumers in general, and to the fruit industry as a whole.

A critical part of the policymaking process was the Commissioner's decision to make a decision in the early morning hours of March 13, rather than to await more surveillance and testing. If he had waited, the plaintiffs might not have suffered the injury of which they complain. Of course, the Commissioner did not wait and, unfortunately, that injury did occur. The point, however, is that the decision about when the data were sufficient to permit responsible decisionmaking involved questions of "social, economic, and political policy." Varig Airlines, 467 U.S. at 814. That decision was an inherent part of the policymaking process and just as susceptible of being skewed by the prospect of judicial second guessing as any other part of the process. Thus, the Commissioner's decisions both involved an element of judgment or choice, and were the kind of choices "that the discretionary function exception was designed to shield." Berkovitz, 486 U.S. at 536.

C.

The plaintiffs attempt to avoid application of the discretionary function exception by looking behind the injury-causing decision and finding fault with an aspect of the data on which it may have been based. The gist of their complaint is that the FDA's Philadelphia laboratory's tests were negligently performed because the procedures used conformed neither to the FDA's Regulatory Procedures Manual nor to good laboratory practices generally. Thus, the plaintiffs claim, their complaint is "based on" the behavior of the laboratory technicians and not on the FDA Commissioner's decisions to bar fruit from Chile and to remove it from the marketplace. The methods employed by the laboratory technicians while testing the grapes, they argue further, did not involve "the permissible exercise of policy judgment," Berkovitz, 486 U.S. at 537, and accordingly were not themselves protected by the discretionary function exception.

We acknowledge that simply as a matter of semantics, it is possible to characterize the plaintiffs' claims as being "based upon" the conduct of the Philadelphia laboratory technicians. We nevertheless reject that proposed characterization because it is inconsistent with the purpose of the discretionary function exception.

The plaintiffs emphasize that this case comes to us on a grant of a motion to dismiss, and that we must accept their version of the facts as true. This is, of course, an accurate statement of the law. But the fact that we must accept the plaintiffs' version of the facts as true does not mean that we

must accept plaintiffs' characterization of those facts.  We know of no authority for the proposition that plaintiffs, by the manner in which they draft their complaints, may dictate that their claims are "based upon" one government employee's actions and not another's.  The relevant authority is to the contrary.  Cf. United States v. Neustadt, 366 U.S. 696, 703-06 & n.13 (1961) (holding that federal law, not state law or the language of plaintiff's complaint, governs the applicability of 28 U.S.C. § 2680(h)'s retention of sovereign immunity in cases where the plaintiff's claim "arise[s] out of . . . misrepresentation"); Kosak v. United States, 465 U.S. 848, 851-62 (1984) (whether plaintiff's claim "aros[e] in respect of . . . the detention of any goods or merchandise by any officer of customs" for the purposes of 28 U.S.C. § 2680(c) is an independent question of federal law the resolution of which depends on the terms and purposes of the FTCA).

The reality here is that the injuries of which the plaintiffs complain were caused by the Commissioner's decisions and, as a matter of law, their claims are therefore "based upon" those decisions.  Any other view would defeat the purpose of the discretionary function exception.  In situations like this where the injury complained of is caused by a regulatory policy decision, the fact of the matter is that there is no difference in the quality or quantity of the interference occasioned by judicial second guessing, whether the plaintiff purports to be attacking the data base on which the policy is founded or

acknowledges outright that he or she is challenging the policy itself.

If plaintiffs injured by regulatory policy decisions were permitted to prosecute damage actions by challenging the manner in which the underlying data was collected, federal courts, of necessity, would be required to examine in detail the decisionmaking process of the policy maker to determine what role the challenged data played in the policymaking and what the policymaker's decision would have been if he or she had received the unchallenged data but not the challenged data (or had received other data in lieu of the challenged data). Without such an examination and all of the discovery that would necessarily precede it, a plaintiff in the position of these plaintiffs would be unable to prove a causal link between the alleged negligence and the alleged injury. Yet this is precisely the kind of inquiry that the Supreme Court sought to foreclose when it ruled out any inquiry into an official's "subjective intent in exercising the discretion conferred by statute or regulation." Gaubert, 499 U.S. at 325.

The social cost of permitting the inquiries required by the plaintiffs' theory are prohibitive. First, because the liability-creating decision might be a policy choice at the very highest level of a regulatory agency, the number of persons affected by the decision is potentially staggering and the potential liability virtually unlimited. Second, because of the nature of the inquiry, the demands of the litigation process on

the most valuable human resources of the regulatory agency will be extraordinary. But this is only a part of the picture.

As we have earlier suggested, every policy decision involves an exercise of the policymaker's judgment about the reliability, adequacy, and significance of the information available to him or her. Because of time and expense constraints and because experience teaches that human beings make mistakes in technique, perception, logic, communication, and a myriad of other areas, no decisionmaker can have one hundred percent confidence in the information before him or her at any given point in time. Each responsible decision therefore necessarily reflects the decisionmaker's judgment that it is more desirable to make a decision based on the currently available information than to wait for more complete data or more confirmation of the existing data.

When one appreciates that virtually all policymaking involves judgments about the reliability of the available data, it is not difficult to predict the impact upon policymakers that would result from the fear of virtually unlimited liability and the prospect of virtually interminable litigation associated with the plaintiffs' theory of liability. The "safest" course from the decisionmaker's personal perspective will be to wait for more conclusive data. But that course can carry a very high social cost. This is graphically illustrated by asking what will happen the next time a Commissioner of the FDA has to make decisions like those here involved if the current Commissioner is exposed to this litigation and the United States government is found

liable for all the losses here alleged.  We believe the discretionary function exception was intended to make sure every Commissioner's judgment will not be skewed by such considerations.

D.

The plaintiffs rely principally on two Supreme Court decisions:  Berkovitz v. United States, 486 U.S. 531 (1988), and Indian Towing Co. v. United States, 350 U.S. 61 (1955).  In Berkovitz, the plaintiff had contracted polio from a dose of polio vaccine.  The decisions alleged to have caused the plaintiff's injury were a decision to license the manufacture of the lot from which that plaintiff's dose of vaccine came and the decision to release that lot for use by the public.  The Supreme Court held that the discretionary function exception would not protect those decisions if they were contrary to a previously-established policy which left no discretion to the decisionmakers.  Thus, where the policy previously established by statute and regulation deprived the agency of the authority to license a manufacturer without insisting that it submit specified data to the agency, a decision to license without requiring that submission was not a protected exercise of a discretionary function.  Similarly, if a previously determined policy established objective scientific criteria for release of a lot and deprived the agency of discretion to release a lot not meeting those standards, damage liability could be imposed for a decision to release a lot not meeting those criteria.

The cases before us, unlike Berkovitz, are not cases in which the injury-causing decision was contrary to a previously established policy which deprived the decisionmaker of discretion. The policy previously established by Congress and the FDA called for the Commissioner to make a discretionary decision on whether the public health required a quarantine of Chilean fruit. The plaintiffs have pointed to no statute or regulation that the Commissioner's decision violated. The best they can do is reach behind the Commissioner's decision and point to a laboratory manual that allegedly called for the retention of a portion of the first two perforated, white-ringed grapes. But clearly the laboratory manual was not intended to deprive the Commissioner of the discretion to make the decision that he made on March 13 based on the information available to him at the time.

In Indian Towing, the plaintiff had been injured as a result of the negligent operation of a lighthouse by the Coast Guard. The Court held that although the Coast Guard had no obligation to undertake lighthouse service, once it exercised its discretion to do so, it was obliged to exercise due care. The Court has recently described the basis for decision in Indian Towing as follows:

> The United States was held liable . . . because making sure the light was operational "did not involve any permissible exercise of policy judgment." . . . Indeed, the Government did not even claim the benefit of the exception but unsuccessfully urged that maintaining the light was a governmental function for which it could not be liable.

United States v. Gaubert, 499 U.S. at 326.

       The plaintiffs argue that just as the government, after making the discretionary decision to provide lighthouse services, could not thereafter provide those services negligently, so too the government here, after making a discretionary decision to test incoming Chilean fruit, could not thereafter fail to exercise care in doing the testing.  Besides the fact that the discretionary function exception was not at issue in Indian Towing, the plaintiffs miss the critical distinction between that case and this.  The plaintiff in Indian Towing was injured by the negligently performed lighthouse services and his case accordingly required an inquiry only into how those services were delivered, not into the exercise of policymaking discretion. Here the plaintiffs would not have been injured but for the decisions of the Commissioner and litigation of their cases will require extensive inquiry into the process by which those decisions were made.  Once a policy decision has been made negligence in its non-discretionary execution can give rise to FTCA liability without jeopardizing the interests the discretionary function exception is designed to protect.  Those interests would be jeopardized, however, by allowing these plaintiffs to go forward.  Cf. Patterson v. United States, 881 F.2d 127, 128 (4th Cir. 1989) (in banc) (holding that plaintiffs may not base claim on the non-discretionary action of an Office of Surface Mining ("OSM") inspector because that action was followed by a decision by the OSM not to take further action).

IV.

For the foregoing reasons, we will affirm the order of the district court dismissing the complaints in these cases.

Fisher Bros. Sales, Inc. v. United States


Nos. 93-1182, 93-1205; 93-1206, 93-1207,
93-1208, and 93-1209


**ROTH**, Circuit Judge, Dissenting. Judges Becker, Hutchinson,
Scirica, Lewis and McKee join in the dissent.



I respectfully dissent from the conclusion reached by
the majority. I cannot accept cloaking a decision, which results
from negligently performed laboratory work, with the
discretionary function exception under circumstances in which the
decision maker would expect, first, that the laboratory work will
be performed under scientifically recognized and accepted
techniques and, second, that further actions by the decision
maker will be governed by the results of that testing.

Because I conclude that such circumstances have been
alleged by the plaintiffs in their complaint, I find it improper
for the district court to have dismissed the complaint on the
basis of the discretionary function exception.

In ruling on defendants' motions to dismiss, the
district court focused on the conduct of the FDA as a whole. It

conducted an analysis of the statutes and regulations governing

the FDA, and concluded that

> [u]nder this authorization, FDA had the discretion to act during the Chilean grape crisis. The FDA acted to protect the public from the risk of exposure to poisonous fruit which it learned could be coming from Chile. It had the discretion to test the fruit and determine whether the fruit was adulterated. It also had the discretion to refuse entry into the United States. The actions taken were not violative of any regulatory or statutory provisions. The acts taken were in accordance with the FDA's authority to determine whether or not a specific product should be allowed entrance into the United States. This conduct is grounded in the policy of protecting the public health. The actions were clearly in furtherance of the FDA's statutory mission to protect the American public from adulterated food. All the acts involved judgment and choice and were grounded in policy.

Balmaceda v. United States, 815 F. Supp. 823, 827 (E.D. Pa.

1992). The district court declined to "consider alleged

violations of a laboratory procedures manual because this

argument simply is the basis of the plaintiffs' claim of

negligence." Id. at 826.

I believe, however, that, in analyzing the actions

taken here by the FDA, one must consider carefully whether it is

implicit in the order for tests to be performed that the tests

are both scientifically accepted and reliable. If it is

implicit, I would not extend the discretionary function exception

to actions which predictably follow from the test results. The

discretionary function exception should not protect an official's

decisions, brought about by the results of accepted and reliable

tests, just as it will not protect an official's release of a

noncomplying lot of polio vaccine.  See Berkovitz by Berkovitz v. United States, 486 U.S. 531 (1988).

Moreover, if actions are taken as a result of accepted and reliable testing, they may no longer be the product of independent judgment.  The determination to order testing involved the element of choice.  However, it is not clear from the record before us whether any significant discretion to choose remained after the decision to test or whether a positive test result would implicate a concomitant decision to withdraw the fruit from the market.  If plaintiff can prove the existence of such inevitability, the discretionary function exception may no longer be implicated.  Accord Westfall v. Erwin, 484 U.S. 292, 296-97 (1988) ("When an official's conduct is not the product of independent judgment, the threat of liability cannot detrimentally inhibit that conduct.").

I do not question the majority's conclusion that the Commissioner's action in ordering the testing was discretionary. I believe, however, that the majority's view of the case misapprehends the precise nature of plaintiffs' claims under the FTCA.  Plaintiffs do not argue that the initial decision to test was not a protected discretionary function.  What plaintiffs do argue is that the decision to withdraw Chilean fruit from the market was proximately caused by the positive test results. Plaintiffs contend that the tests performed by the FDA's Philadelphia laboratory were negligently performed in that the procedures used conformed neither to the FDA's Regulatory Procedures Manual nor to good laboratory practices.  Their

complaints allege that, "as a result of the negligent analysis performed and reported by the Philadelphia laboratory, the FDA decided to take three actions: 1) refusing entry into the United States of all Chilean fruit; 2) forcing a market withdrawal of all Chilean fruit already in distribution channels; and 3) issuing a press release informing consumers to refrain from eating Chilean fruit."  Joint Appendix at 169.  Thus, plaintiffs do not challenge the FDA Commissioner's decisions to test fruit from Chile or, based upon properly performed testing, to take action to remove all Chilean fruit from the marketplace.

Because we are considering a motion to dismiss, we must accept as true all of the factual allegations in the complaints. Berkovitz, 486 U.S. at 540, 108 S. Ct. at 1961.  For present purposes, there was no cyanide in the grapes, the FDA technicians were negligent in reaching the conclusion that there was cyanide contamination, and this negligence was the cause-in-fact and proximate cause of the damage to plaintiffs.  Moreover, there is no contention here that the actions of the laboratory technicians, in testing the grapes, involved the permissible exercise of policy judgment.  The technicians are not protected by the exception.

In Berkovitz, the Supreme Court stated that "the discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow.  In this event, the employee has no rightful option but to adhere to the directive." Id. at 536, 108 S. Ct. at 1958-59.  In this case, the plaintiffs allege

that the Regulatory Procedures Manual established procedures to be followed for tests such as those performed at the Philadelphia lab and provided that any modification to those procedures be reduced to writing. Plaintiffs contend that the lab technicians violated the manual's specific instructions in failing to reserve portions of the two punctured grapes for confirmatory testing and in failing to make contemporaneous records of their observations.

The majority speculates that, after receiving the test results, the Commissioner was required to make a judgment about the conflicting findings of the Philadelphia and Cincinnati laboratories and to judge the significance of the Philadelphia laboratory's failure to follow established procedures. See page [typescript at 13-14]. These contentions, however, do not appear in the complaint. In the record before the district court on the motion to dismiss, such speculation would be inappropriate. Plaintiffs' allegations do, however, permit the conclusion that the decision to withdraw Chilean fruit from the market followed as a result of the negligent testing.

I find that such an allegation satisfies the pleading requirements of Berkovitz. Moreover, in Berkovitz, which concerned, inter alia, a claim that the Division of Biologic Standards (DBS) of the National Institutes of Health had wrongfully licensed the production of a polio vaccine, the Court made the following observation:

> If petitioners' claim is that the DBS made a determination that [the vaccine] complied with regulatory standards, but that the determination was incorrect, ... the question turns on whether the manner and method of determining compliance with the safety

> standards at issue involve agency judgment of the kind protected by the discretionary function exception. Petitioners contend that the determination involves the application of objective scientific standards, ... whereas the Government asserts that the determination incorporates considerable "policy judgment" ... . In making these assertions, the parties have framed the issue appropriately; application of the discretionary function exception to the claim that the determination of compliance was incorrect hinges on whether the agency officials making that determination permissibly exercise policy choice.

Id. at 544-45, 108 S. Ct. at 1963 (footnote omitted). As this passage makes clear, judgment guided purely by scientific or other objective principles does not involve discretion for purposes of the discretionary function exception. See also Griffin v. United States, 500 F.2d 1059, 1066 (3d Cir. 1974) ("Where the conduct of Government employees in implementing agency regulations requires only performance of scientific evaluation and not the formulation of policy, we do not believe that the conduct is immunized from judicial review as a 'discretionary function.'"); Ayala v. United States, 980 F.2d 1342, 1349-50 (10th Cir. 1992) ("We fail to see how the determination in this case can be labeled a policy decision. The choice was governed, as plaintiffs contend, by 'objective principles of electrical engineering.'").

In Berkovitz, the specifications for licensing vaccine or releasing lots of vaccine had been incorporated in procedures and regulations. In the present case, the Commissioner did not have specific procedures established for handling fruit to determine if it had been contaminated. Nevertheless, the plaintiffs allege that the technicians' sole purpose in testing

the suspect grapes was to determine whether they had been injected with cyanide.  Appellants claim that the technicians were provided with precise, objective, scientific standards to use in the testing.  Any decisions made in the course of testing concerning what portions of the grapes to test or how to conduct the tests should have been made solely with reference to these principles of science.  I am not persuaded that this situation is significantly different from that in Berkovitz.

Social, economic, and political factors--those involved in the kinds of decisions Congress intended to shield from liability--had no place in the decision making process once the Commissioner decided to order testing.  Consequently, if the district court were to adjudicate this case as it is alleged in the complaint by plaintiffs, the court would not be "second-guessing" a policy-based decision.  Instead, by measuring the technicians' conduct against the procedures they were to have followed and principles of good laboratory practice, it would be undertaking the sort of inquiry that courts are called on to make all the time.

Moreover, I do not find it significant that the conduct challenged here was embedded within the clearly discretionary consideration of whether to test incoming fruit or to remove all Chilean fruit from the market.  With respect to the decision to test fruit in the first place, I am guided by the body of law "holding that once the government makes a policy decision protected by the discretionary function exception, it must proceed with due care in the implementation of that decision."

Caplan v. United States, 877 F.2d 1314, 1316 (6th Cir. 1989).

This line of cases has grown out of the Supreme Court's decision

in Indian Towing Co., Inc. v. United States, 350 U.S. 61, 76 S.

Ct. 122, 100 L. Ed. 48 (1955), which concerned an action against

the Coast Guard for negligent operation of a lighthouse.  The

Court stated:

> The Coast Guard need not undertake the lighthouse service.  But once it exercised its discretion to operate a light on Chandeleur Island and engendered reliance on the guidance afforded by the light, it was obligated to use due care to make certain that the light was kept in good working order; and, if the light did become extinguished, then the Coast Guard was further obligated to use due care to discover this fact and to repair the light or give warning that it was not functioning.  If the Coast Guard failed in its duty and damage was thereby caused to petitioners, the United States is liable under the Tort Claims Act.

Id. at 69, 76 S. Ct. at 126-27.  In this case, once the FDA

exercised its discretion to test incoming Chilean fruit, it

incurred the obligation to use due care in doing so.

Nor am I led to a different result by the fact that the

alleged negligence in the laboratory was followed by a decision

that was, at the very least, a "but for" cause of the harm to

plaintiffs.[2]  I am not persuaded by the majority's contention

---

[2].  While I suspect that plaintiffs may encounter

difficulty in attempting to prove that the alleged negligence of

the lab technicians, rather than the Commissioner's decision, was

the proximate cause of their injuries, I cannot allow that

perception to color my analysis here.  Instead, I must accept the

allegations in plaintiffs' complaints as true.  Those allegations

that the possibility of liability will have an undesirable effect on policymakers who find themselves in a position analogous to that of the FDA Commissioner in this case. Because there is an obligation to use due care in operating a lighthouse or licensing a polio vaccine or testing a grape for cyanide, decisions arising from the execution of that duty must be based upon the proper performance of that duty. The desired result is that the purely technical aspects of any such decision will be properly

(..continued)
are directed at harm allegedly caused to plaintiffs by the negligent testing. The district court may appropriately consider causation in subsequent stages of these proceedings, such as in deciding whether to grant a motion for summary judgment. See Appley Brothers v. United States, 7 F.3d 720, 725 and n.2 (8th Cir. 1993) (Reversing district court's dismissal of suit, pursuant to discretionary function exception, on ground that plaintiffs based their claim on Department of Agriculture's negligent inspection of warehouse rather than on USDA's decision whether or not to revoke warehouse license; as to the issue of causation, the court of appeals held that the "question of whether appellants failed to state a cause of action was not before the district court, and is not an issue in this appeal."). I believe, however, that the factor of causation has no place in my consideration of whether the discretionary function exception applies to plaintiffs' allegations as they are presently expressed in the complaint.

conducted. If there is a chilling effect, as the majority fears there will be, the chill must be directed to ensure the non-negligent operation of the lighthouse or the non-negligent licensing of the polio vaccine or the non-negligent examination of the grapes. Just as the requirements for licensing a polio vaccine are discretionary but the steps to determine that a particular batch of vaccine is properly licensable are not discretionary, so too the removal from the market of cyanide-contaminated grapes may be discretionary but the proper performance of established tests to detect the contamination is not.

In effect, I see no reason to believe that a finding of liability against the government in this case would have consequences of a different nature or to a greater extent than a finding of liability against the government in either Indian Towing or Berkovitz. When an official makes a policy decision--to build a lighthouse or to license a vaccine or to remove fruit from the market--the possibility of tort liability may factor into the analysis. However, the focus of that consideration should be the ability of the government to perform the tasks which follow from the decision to implement the action. If the government agency cannot reasonably expect to be able non-negligently to operate a lighthouse or to license a vaccine or to test a grape for cyanide, this factor should be considered in instituting the line of action in the first place. If testing grapes for cyanide were difficult or the results of such testing not reliable, the Commissioner might better exercise his

discretion by withdrawing grapes from the market without having them tested.  However, once the decision was made to do the testing, the discretionary function exception should not protect the government from the consequences of the negligence of the laboratory technicians in performing their routine duties.

For the above reasons, I would reverse the dismissal of this case by the district court and would remand it for further proceedings.