**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 4 1999**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

FRANKLIN SAVINGS
CORPORATION; FRANKLIN
SAVINGS ASSOCIATION,

      Plaintiffs-Appellants,

v.

UNITED STATES OF AMERICA;
FEDERAL DEPOSIT INSURANCE
CORPORATION, as successor-in-
interest to the Resolution Trust
Corporation,

      Defendants-Appellees.

No. 97-3220

---

Appeal from the United States District Court
for the District of Kansas
(D.C. No. 95-CV-2100-GTV)

---

R. Pete Smith, (Jonathan A. Margolies with him on the brief), of McDowell, Rice,
Smith & Gaar, Kansas City, Missouri for Appellants.

Michael S. Raab, Attorney, Appellate Staff, Civil Division, U. S. Department of
Justice, Washington, D.C. (Mark B. Stern, Attorney, Appellate Staff, Civil
Division, U. S. Department of Justice, with him on the brief) for Appellees.

---

Before **BALDOCK, KELLY,** and **MURPHY,** Circuit Judges.

**MURPHY**, Circuit Judge.

This appeal concerns the breadth of the discretionary-function exception to the waiver of sovereign immunity under the Federal Tort Claims Act (FTCA). Plaintiffs, who owned most of the stock of the Franklin Savings Association (FSA or the Association), sued the United States and the Resolution Trust Corporation[1] (RTC), seeking damages allegedly caused by the RTC's conduct as FSA's conservator. Before any discovery, the district court dismissed the suit under Federal Rule of Civil Procedure 12(b)(6) on the basis that plaintiffs' claims fell within the FTCA's discretionary-function exception. This court has jurisdiction of plaintiffs' appeal under 28 U.S.C. § 1291.

Plaintiffs primarily argue that their claims arise not from the RTC's performance of a discretionary function, but from its violation of specific, mandatory duties while managing FSA. Those duties include a specific dictate in the order creating the conservatorship that the RTC conserve and not liquidate the Association. Plaintiffs argue that the RTC nonetheless intentionally effected a *de facto* liquidation of FSA under the guise of conserving it. They thus allege that the RTC acted in subjective bad faith while performing acts which, viewed

---

[1]The Federal Deposit Insurance Corporation (FDIC) is now a defendant as the RTC's successor-in-interest. *See* 12 U.S.C. § 1441a(m)(1).

objectively, fall within the scope of a discretionary function. This poses the question whether such allegations should bar dismissal under the discretionary-function exception. Because this court concludes that the exception's purpose compels dismissal of any claim whose ultimate resolution would require judicial scrutiny of an official's good faith or subjective decisionmaking, we **AFFIRM**.

## II.    PROCEDURAL AND FACTUAL BACKGROUND

This is the third appeal to this court and the seventh published opinion involving disputes over the conservation and liquidation of the long-gone but not forgotten Franklin Savings Association. *See Franklin Sav. Ass'n v. Office of Thrift Supervision*, 740 F. Supp. 1535 (denying summary judgment), 742 F. Supp. 1089 (D. Kan.1990) (granting judgment after trial), *rev'd*, 934 F.2d 1127 (10th Cir. 1991) [*Franklin I*]; *Franklin Sav. Ass'n v. Office of Thrift Supervision*, 821 F. Supp. 1414 (D. Kan.1993), *aff'd*, 35 F.3d 1466 (10th Cir. 1994) [*Franklin II*]; *Franklin Savings Corp. v. United States*, 970 F. Supp. 855 (D. Kan. 1997) (decision now on appeal) [*Franklin III*]. This court has distilled the following summary of the litigation from *Franklin II*. *See* 35 F.3d at 1468.

In 1990 the Director of the Office of Thrift Supervision (OTS) determined that FSA was "in an unsafe and unsound condition to transact business" and appointed the RTC as its conservator. [2] FSA and its parent, Franklin Savings

---

[2]For a "generalized and simplified overview of the facts" leading to the conservatorship, see *Franklin I*, 934 F.2d at 1133–35. For a more detailed

(continued...)

Corporation (FSC), filed suit under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA) to remove the conservator. *See* 12 U.S.C. § 1464(d)(2)(E) (1989) (authorizing appointment and judicial review); *see generally* 12 U.S.C. §§ 1461–1470 (1989). While the district court held the appointment arbitrary and capricious, this court reversed, holding that review of the decision to appoint a conservator is limited to the administrative record and that said record supported the decision. *See Franklin I*, 742 F. Supp. at 1126, *rev'd*, 934 F.2d at 1149. In 1992, after the first suit had been dismissed, the OTS changed the RTC's role from conservator to receiver. *See* 57 Fed. Reg. 41,969 (1992). FSA and FSC again sued. In 1994 this court affirmed the dismissal of that suit on the ground the decision to appoint a receiver is not subject to judicial review. *See Franklin II*, 821 F. Supp. at 1418–24, *aff'd*, 35 F.3d at 1469–71.

The present action, meanwhile, arose from plaintiffs' 1993 filing of an adversary complaint against the RTC in bankruptcy court, in a proceeding concerning the estate of FSC. *See Franklin III*, 970 F. Supp. at 860. The complaint sought damages under the FTCA based on the RTC's acts as conservator. *See id.* The district court withdrew the reference from the bankruptcy court, and plaintiffs amended their complaint to name the FDIC, the

---

[2](...continued)
account, see *Franklin I*, 742 F. Supp. at 1099–1124.

RTC's successor-in-interest. [3] *See id.* The government moved to dismiss all claims for lack of subject-matter jurisdiction. The court granted the motion, and this appeal followed. [4]

On appeal, plaintiffs primarily challenge the dismissal of their FTCA claim. They premise that claim on the RTC's conduct in 1990–92, while it was acting under an order appointing it "as conservator . . . not for the purpose of liquidation." Plaintiffs argue that the RTC disregarded that specific mandate, ignored various narrower mandates in its own manuals governing conservatorships, and breached its fiduciary duties as a conservator by intentionally effecting a *de facto* liquidation of the Association.

Plaintiffs specifically decry four sets of transactions from which they infer the RTC's *sub rosa* intent to liquidate the Association. Three of these involve allegedly precipitate, all-or-nothing sales of asset portfolios in saturated markets. The fourth involves an omission: before issuing reports on FSA's capital, the RTC did not exercise its statutory power to repudiate burdensome, high-interest bonds issued by FSA. The capital reports, which reflected asset write-downs that had decreased FSA's equity, caused the bond trustee to defease the bonds,

---

[3]Plaintiffs also added a claim under the Administrative Procedure Act (APA), which the court also dismissed. *See Franklin III*, 970 F. Supp. at 860, 863–64. On appeal, plaintiffs advance no reason to reinstate that claim other than the bankruptcy-code argument discussed *infra* at 7–9.

[4]Plaintiffs' motion to supplement the record on appeal is granted.

triggering large losses for FSA. Plaintiffs argue that the RTC engaged in such conduct in order to deplete FSA's capital and thereby retrospectively justify the OTS's appointment of a conservator. They allege that the RTC caused FSA to lose some $500 million in potential profits, thus ensuring the Association's future liquidation rather than its conservation and eventual return to plaintiffs' control.

III.   DISCUSSION

Plaintiffs' complaint included two damage claims pertinent to this appeal: one against the United States under the FTCA, and one against the FDIC at common law. [5] On appeal, the plaintiffs assert three ways the government has

---

[5]Plaintiffs sued in the names of both FSC and FSA. The Government disputed their right to sue in either capacity. It argued that FSA had not filed an administrative claim, as the FTCA requires. *See Franklin III*, 970 F. Supp. at 861 (citing 28 U.S.C. § 2675(a)). FSC had filed a claim, but the Government argued that it could not bring either a shareholder-derivative suit, as it had not first demanded that FSA's directors file suit, or a direct claim, as its injuries were derivative. *See id.* The district court agreed that FSA could not sue, and that FSC could not sue directly. It held, however, that FSC could bring a derivative claim, because it would have been futile to demand of the FDIC, which now directs the Association, that it essentially sue itself. *See id.* at 861–63.

Both parties appeal those rulings, but this court need not resolve those issues. Our affirmance on the discretionary-function exception disposes of all of plaintiffs' claims, direct or derivative. Whether a suit falls within the exception is a threshold question of subject-matter jurisdiction. *See, e.g., Tippett v. United States*, 108 F.3d 1194, 1196-97 (10th Cir. 1997); *Daigle v. Shell Oil Co.*, 972 F.2d 1527, 1537 (10th Cir. 1992). Neither party suggests that the inquiry differs if the suit is direct or derivative. Only if this court were to hold that there is subject-matter jurisdiction under the FTCA, or under another waiver of immunity, would we have to decide whether Kansas law entitles plaintiffs to sue directly, derivatively, or neither. This is true even if we also deem the latter questions "jurisdictional." *See Arizonans for Official English v. Arizona*, 520 U.S. 43, 66–67 (1997) (holding that court may assume standing, despite grave doubts, in

(continued...)

-6-

waived sovereign immunity: (1) under the Bankruptcy Code, 11 U.S.C. § 106; (2) under the FTCA, because the discretionary-function exception does not apply; and (3) under the RTC's and FDIC's sue-and-be-sued clauses. [6]

A.    Plaintiffs Have Waived Reliance on Bankruptcy Code § 106

Plaintiffs' first argument is easily dispatched, for their complaint did not allege Bankruptcy Code § 106 as a basis for subject-matter jurisdiction, and they never sought leave to amend their complaint to do so, or in any way asked the district court to assume jurisdiction under that provision. Plaintiffs address this problem by invoking the long-established rule that defects in subject-matter jurisdiction can never be waived and may be raised at any time on appeal. *See Mansfield, Coldwater & Lake Mich. Ry. v. Swan*, 111 U. S. 379, 382 (1884); Fed. R. Civ. P. 12(h)(3); *and, e.g., Laughlin v. K Mart Corp.*, 50 F.3d 871, 873 (10th Cir. 1995). This court, however, has held that "our responsibility to ensure even *sua sponte* that we have subject matter jurisdiction before considering a case

---

[5](...continued)
order to decide mootness, as both questions concern Article III jurisdiction, not the merits); *Cross-Sound Ferry Servs., Inc., v. ICC,* 934 F.2d 327, 341 (D.C. Cir. 1991) ("[C]ourts properly rest on one jurisdictional ground instead of another."), *overruled in other part by Steel Co. v. Citizens for a Better Envir.*, 523 U.S. 83, __, 118 S.Ct. 1003, 1012 (1998).

[6]Plaintiffs also briefly argue that dismissal before discovery was premature. They develop this argument so superficially, however, as to waive it. *See, e.g., Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.,* 131 F.3d 874, 880 & n.9 (10th Cir. 1997) (holding that party who noted issue and made "several broad, conclusory statements" on appeal waived argument for failure to develop).

differs from our discretion to eschew untimely raised legal theories which may support that jurisdiction." *Daigle v. Shell Oil Co.*, 972 F.2d 1527, 1539 (10th Cir. 1992); *see also United States ex rel. Ramseyer v. Century Healthcare Corp.*, 90 F.3d 1514, 1518 n.2 (10th Cir. 1996) (declining to consider *sua sponte* a basis for jurisdiction not argued below or on appeal).

Plaintiffs attempt to distinguish *Daigle*. They acknowledge that this court refused to consider a waived argument supporting jurisdiction of Daigle's suit. They argue, however, that we did so because the argument involved disputed factual issues on which the district court had made no findings. Plaintiffs assert that their bankruptcy argument, by contrast, presents "a pristine legal question."

Plaintiffs misread *Daigle*. This court held that we have no duty to consider waived arguments supporting subject-matter jurisdiction. *See* 972 F.2d at 1539. We then noted our discretion to ignore a waiver, in any case, if "presented with a strictly legal question the proper resolution of which is beyond doubt." *Id.*[7] In declining to apply that exception, this court saw no need to "delve into an in depth analysis" of the jurisdictional issue, instead simply noting that Daigle's new arguments "[did] not go unchallenged." *Id.* at 1540.[8] The same is true here:

---

[7]Courts may also ignore a waiver "when manifest injustice would otherwise result." *Daigle*, 972 F.2d at 1539. Plaintiffs do not suggest that we must over-look their waiver of the § 106 argument in order to avoid "manifest injustice."

[8]This court did note the lack of a fully developed record, but we relied equally on Daigle's failure to "undoubtedly demonstrate[] an unequivocal waiver of

(continued...)

-8-

plaintiffs argue plausibly that the government waives its discretionary-function immunity by filing a claim in bankruptcy against the victim's estate. The government argues plausibly to the contrary. Plaintiffs may have shown that the legal question they raise is "pristine," but they have not shown, as they must, that its "proper resolution . . . is beyond doubt." *Id.* at 1539. This court thus declines to overlook their waiver.

B.   The Discretionary-Function Exception to the FTCA's Waiver of Sovereign Immunity

1.   *Standard of Review*

The government moved to dismiss the FTCA claims under Rules 12(b)(1) and (6), and the court treated the motion as one to dismiss for failure to state a claim under Rule 12(b)(6). *See Franklin III*, 970 F. Supp. at 860–61. [9] As the court recognized, it must convert a Rule 12(b)(1) motion to one under Rule 12(b)(6), or for summary judgment, "'[i]f the jurisdictional question is intertwined with the merits of the case.'" *Bell v. United States*, 127 F.3d 1226, 1228 (10th Cir. 1997) (quoting *Wheeler v. Hurdman*, 825 F.2d 257, 259 (10th Cir. 1987)). Whether the discretionary-function exception applies is such a question. *See id.*;

_____

[8](...continued)
sovereign immunity." *Id.* at 1540.

[9]The district court thus did not consider two affidavits which the government filed. *See Franklin III*, 970 F. Supp. at 861 n.4. It did, however, consider the RTC manuals and directives which plaintiffs appended to and incorporated by reference in their complaint. *See id.* at 865–66.

*Tippett v. United States*, 108 F.3d 1194, 1196 (10th Cir. 1997). This court reviews *de novo* a Rule 12(b)(6) dismissal. *See Tippett*, 108 F.3d at 1196–97.

2. *Summary of Applicable Law*

To avoid dismissal of an FTCA claim under the discretionary-function exception, a plaintiff must allege facts that place its claim facially outside the exception. *See Kiehn v. United States*, 984 F.2d 1100, 1105 n.7 (10th Cir. 1993). The district court held that plaintiffs' claims fell within the exception, which this court recently explained as follows:

> Under the FTCA, the United States waives its sovereign immunity with respect to certain injuries caused by government employees acting within the scope of their employment. 28 U.S.C. § 1346(b). The FTCA contains an exception to this broad waiver of immunity, however, for claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." *Id.* § 2680(a). . . . "The discretionary function exception . . . marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 808 (1984). If the discretionary function exception applies to the challenged governmental conduct, the United States retains its sovereign immunity, and the district court lacks subject matter jurisdiction to hear the suit. *See Johnson v. United States Dep't of Interior*, 949 F.2d 332, 335 (10th Cir. 1991).

*Tippett*, 108 F.3d at 1196–97 (second omission in original).

In dozens of cases in the last decade, this court has determined whether government conduct was within the exception by using a two-branch analysis

announced in *Berkovitz ex rel. Berkovitz v. United States*, 486 U.S. 531, 536–37 (1988). This court has summarized the analysis as follows:

> First, we determine whether the governmental conduct at issue "is a matter of choice for the acting employee." [*Berkovitz*, 486 U.S.] at 536. "[C]onduct cannot be discretionary unless it involves an element of judgment or choice. Thus, the discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Id.* (citation omitted). In such a situation, "the employee has no rightful option but to adhere to the directive." *Id.*
>
> If the conduct at issue involves an element of judgment or choice, *Berkovitz* requires us to "determine whether that judgment is of the kind that the discretionary function exception was designed to shield." *Id.* Congress preserved governmental immunity for discretionary functions to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Id.* at 536-37. Therefore, the exception "protects only governmental actions and decisions based on considerations of public policy." *Id.* at 537.

*Bell*, 127 F.3d at 1228–29. This court has also noted the Supreme Court's modification of *Berkovitz*'s second branch: "Only decisions that are 'susceptible to policy analysis' are protected by the . . . exception." *Daigle*, 972 F.2d at 1538 (quoting *Gaubert v. United States*, 499 U.S. 315, 325 (1991)); *see infra* at 22–23 (discussing distinction between decisions "based on" and "susceptible to" policy analysis).

3. *Plaintiffs' FTCA Claims*

Plaintiffs' general grievance is that the RTC violated the provision in the OTS order that the appointment was "not for the purpose of liquidation." Notwithstanding that dictate, plaintiffs claim, the RTC proceeded to liquidate FSA. To add specific content to this most general claim, plaintiffs contend that the RTC breached twenty specific, mandatory requirements detailed in several agency manuals and directives which guided RTC employees in managing institutions the RTC was appointed to conserve.

a. Plaintiffs' claims are not based upon the breach of any specific, mandatory requirements contained in RTC manuals and directives.

The gravamen of plaintiffs' complaint is that the RTC engaged in unwise asset sales without considering all relevant factors. Plaintiffs contend the RTC thereby impaired FSA's franchise value and failed to maintain the value, or maximize the sale price, of its assets. Plaintiffs ultimately contend that these failures show that the RTC's intent was never to conserve FSA, but was from the start to liquidate it. In other words, the RTC's decisions whether, when, and how to sell or manage various assets are consistent with an intent to liquidate, and inconsistent with an intent to conserve.

Day-to-day decisions in operating a financial institution involve discretion. Unless a regulation specifically mandates a particular action, such decisions satisfy the first branch of *Berkovitz*. *See Gaubert*, 499 U.S. at 325–31 (1991) (applying

*Berkovitz* to management of savings-and-loan). "Day-to-day management of banking affairs, like the management of other businesses, regularly requires judgment as to which of a range of permissible courses is the wisest." *Id.* at 325. The Court found it "plain" that the actions at issue in *Gaubert* "involved the exercise of choice and judgment." *Id.* at 331. [10]

To distinguish *Gaubert*, plaintiffs must identify regulations governing the RTC's day-to-day management of a savings association that are sufficiently specific and mandatory to eliminate the discretion that such management "plain[ly]" entails. After listing their twenty "specific and mandatory" provisions, plaintiffs challenge the particular sets of transactions discussed *supra* at 5. They focus on five requirements that the RTC allegedly violated in those transactions.

        i.     *Most of the requirements on which plaintiffs focus are not*
                    *specific and mandatory.*

Four of the five requirements are to maintain asset values, avoid sales that reduce franchise value, maximize value, and schedule sales based on various concerns:

---

[10]The Court rejected the argument "that the challenged actions fall outside the discretionary function exception because they involved the mere application of technical skills and business expertise." *Gaubert*, 499 U.S. at 331. That was "just another way of saying that the considerations involv[ed in] the day-to-day management of a business concern such as [a savings association] are so precisely formulated that decisions at the operational level never involve the exercise of discretion within the meaning of § 2680(a), a notion that we . . . reject[]." *Id.*

-13-

- The RTC's Asset Management and Disposition Manual has an asset-marketing section, whose "purpose . . . is to establish policy guidelines for the packaging and sale of loans and other assets." It declares a policy of "tak[ing] the necessary steps to ensure that asset integrity and value are maintained in order to maximize sales opportunities."

- The above section also notes that "[a]sset sales should . . . occur quickly after [a financial] institution is placed into conservatorship if the sale does not negatively impact the franchise value of the institution."

- The "Background" paragraph of a directive on selling and managing securities says that the "RTC is charged with, among other things, the maximization of value in the timely and efficient disposition of securities."

- The same directive also lists responsibilities of the RTC Capital Markets Branch. It directs the Branch to "[m]anage and schedule timing of securities sales based on needs of institutions, market conditions, type of security, and ease of sale."

None of the four constitutes a "specific and mandatory requirement" as this court's precedents define that term. Instead, they all state general goals, or sets of objectives to balance, in precatory rather than mandatory language.

In *Tippett* this court held that a Park Service policy that "[t]he saving of human life will take precedence over all other management actions" was "too general to remove the discretion from [a Park Ranger's] conduct" in a situation that threatened human life. *See* 108 F.3d at 1197. In *Daigle* this court addressed a statute defining environmental-remediation actions "necessary to prevent, minimize, or mitigate damage to the public health or welfare." The statute specified that the actions should "attain a degree of cleanup . . . [which,] at a minimum . . . [en]sures protection of human health and the environment." *See*

-14-

*Daigle* , 972 F.2d at 1540 (analyzing 42 U.S.C. §§ 9601(23) & 9621(d)(1)). It thus specified minimum attainments without specifying a course of action to attain them. This court held the statute did not contain "specific and mandatory directives." *See id.*

The four passages above are no more specific or mandatory than those in *Tippett* and *Daigle* . The first, which refers to RTC "policy," leaves it to employees to decide which "steps" are "necessary." The second mentions asset sales that "negatively impact the franchise value of the institution" as an unelaborated caveat to a provision *encouraging* sales. It does not mandate any specific process or formula for determining which sales will have such an impact. The third describes "maximization of value" as one RTC duty "among other things." It neither elaborates that general command nor specifies how to perform the discretionary task of balancing timeliness, efficiency, and return. The final passage lists four broad considerations to balance, in an unspecified calculus, without specifying a course of action for the complex task of managing asset sales.

      ii.     *Plaintiffs failed to allege a damage claim for breach of a specific, mandatory duty to prepare case memoranda.*

The lone potentially troubling requirement among the five on which plaintiffs have focused is found in the RTC's Asset Management and Disposition Manual. It directs employees preparing case memoranda, which are "formal written document[s] used to request authorization to take . . . action on behalf of

-15-

the RTC," to compare the proposed action to available alternatives. It specifies that "[a]ll the alternatives must be weighed comprehensively and objectively to determine the course of action in the best interest of the RTC." There is some question whether that passage would qualify as a "specific and mandatory directive." [11] Even if it does, however, plaintiffs' complaint was deficient because, as discussed below, it did not identify the mere failure to physically prepare case memoranda weighing alternatives as the cause of plaintiffs' injuries.

_____

[11]To allow plaintiffs to avoid the discretionary-function bar by alleging that RTC employees breached a specific duty to report information, even though the harmful decisions based on the information were themselves discretionary, would be in tension with precedent. *See Johnson v. United States*, 949 F.2d 332, 339–40 (10th Cir. 1991) (rejecting attempt to base claim not only on discretionary decision how to conduct rescue, but on allegedly nondiscretionary tasks of gathering and communicating data about accident, as latter tasks are "inextricably tied" to former, leaving "[n]o meaningful way . . . to consider [those tasks] apart from the total rescue decision"). In *Johnson,* however, no specific, mandatory requirement governed the information-gathering or communication. *See* 949 F.2d at 340 n.10. *Johnson* thus does not foreclose an FTCA suit based on negligence that did violate such a requirement.

Other circuits' precedent is divided. *Compare Fisher Bros. Sales v. United States*, 46 F.3d 279, 286–87 (3rd Cir. 1995) (*en banc*) (7–6) (barring such claims absolutely) *with Gray v. Bell*, 712 F.2d 490, 515–16 (D.C. Cir. 1983) (barring claim, but foreseeing exceptions to rule) (cited in *Johnson*, 949 F.2d at 340) *and Payton v. United States*, 679 F.2d 475, 482 & n.6 (5th Cir. Unit B 1982) (*en banc*) (similar, and similarly cited)). *See also In re* The Glacier Bay, 71 F.3d 1447, 1451–54 (9th Cir. 1995) (allowing comparable claim); *General Dynamics Corp. v. United States*, 139 F.3d 1280, 1283–86 (9th Cir. 1998) (trying to harmonize *Fisher Bros.* and *Glacier Bay*); *id.* at 1287–88 (O'Scannlain, J., dissenting). *See generally* Richard H. Seamon, *Causation and the Discretionary Function Exception to the Federal Tort Claims Act*, 30 U.C. Davis L. Rev. 691 (1997). Because plaintiffs' claim is not actually based on a duty to report information, as discussed in text, this court expresses no opinion on the legal viability of such a claim.

The government denies that this passage is specific and mandatory. It argues that the passage simply "provides for alternatives to be 'weighed . . .'" and thus "implicitly granted RTC discretion to identify the pertinent options and determine the weight to attribute to each." This argument has force insofar as it goes. But the passage does not only concern the discretionary and unquantifiable mental process of weighing alternatives. It also concerns the arguably nondiscretionary and definitely quantifiable physical process of drafting memoranda which weigh alternatives. On review of this Rule 12(b)(6) dismissal, this court must assume that RTC employees did not draft case memoranda seeking authorization for the challenged transactions, or that, if they did, such memoranda failed to identify and weigh alternatives.

While the government has ignored the potential significance of a requirement not just to weigh alternatives but to record the process in writing, plaintiffs have ignored it as well. Their complaint did not attribute any harm to the breach of a specific mandate to draft memoranda, as opposed to a failure to perform the discretionary function of weighing options. In that part of their complaint listing specific, mandatory requirements, plaintiffs simply allege that the RTC "failed to prepare Case Memoranda in the manner specifically mandated" and "failed to comprehensively and objectively weigh the alternative actions available to it as specifically mandated." Their complaint then details three of the four "liquidation transactions" on which plaintiffs focus on appeal. In describing

-17-

each transaction, the complaint perfunctorily and identically recites that the RTC acted "without comprehensively and objectively weighing the alternative actions available to it." Nowhere else in their 28-page complaint or in their response to the government's motion to dismiss did plaintiffs allude in any way to the specific duty to draft case memoranda.

After the bald assertion that the RTC failed to prepare memoranda weighing alternatives, the only parts of the complaint which in any way linked that requirement to any particular events or injuries simply alleged that the RTC did not "comprehensively and objectively weigh the alternative actions available." The complaint does not suggest that plaintiffs' multi-million-dollar injuries flow from a failure to perform the arguably nondiscretionary function of drafting memoranda listing alternatives, and not from neglect of the discretionary function of "comprehensively and objectively weigh[ing] the alternative actions available." Most importantly, plaintiffs have not argued on appeal that the district court should have read their complaint to allege that a failure to memorialize, as opposed to a failure to weigh options, caused their injuries.

iii.    *Conclusion* .

Accordingly, as discussed above and in the district court's opinion, [12] none of the twenty provisions that the RTC allegedly violated can enable plaintiffs to show that their asserted injuries are based upon nondiscretionary conduct. Those provisions thus afford no basis for reinstating plaintiffs' dismissed complaint.

b.      Plaintiffs cannot avoid the discretionary-function bar by alleging the RTC intentionally ignored its specific mandate to conserve and not liquidate FSA.

Plaintiffs' main argument is that "[t]he RTC as conservator was required to . . . operate and preserve FSA. Instead, it liquidated FSA and failed to carry out this nondiscretionary obligation." Plaintiffs note that the OTS order appointed the RTC "as conservator for the Association, not for the purpose of liquidation." They detail statutory provisions governing the RTC and reflecting a congressional intent "that only receivers, and not conservators, have the power to liquidate." *Compare* 12 U.S.C. § 1821(d)(2)(D) (conservator's powers) *with* §§ 1821(c)(13)(B) & (d)(2)(E) (receiver's powers). Plaintiffs argue that, because their complaint was dismissed under Rule 12(b)(6), this court must assume the truth of their factual allegations, i.e., that the RTC intentionally chose to liquidate rather than conserve

---

[12]This court agrees with the district court, for substantially the reasons stated in its opinion, that plaintiffs have not shown that any of the remaining fifteen requirements is both (a) specific and mandatory and (b) a basis for their claims. *See Franklin III*, 970 F. Supp. at 865–66. Plaintiffs' brief on appeal merely repeats *verbatim* the complaint's list of those requirements.

the Association, in violation of the OTS order. If so, then the RTC consciously violated the specific duty mandated by that order, stripping itself of the sovereign immunity preserved by the FTCA's discretionary-function exception.

The specific transactions that plaintiffs challenge as revealing the RTC's intentional violation of the order to conserve and not liquidate are mainly asset sales. [13] The RTC's broad authority specifically included power to sell assets of institutions it was appointed to conserve. *See* 12 U.S.C. § 1821(d)(2)(G)(i)(II) (authorizing FDIC/RTC as conservator to "transfer any asset or liability" of institution). Plaintiffs do not dispute the discretionary character of asset sales, beyond unsuccessfully invoking the RTC manuals. Two related questions, however, must be resolved: (1) can plaintiffs avoid the discretionary-function bar by alleging that RTC employees performed facially authorized acts with an intent to liquidate; (2) are plaintiffs entitled to discovery to show that the sales were meant not to conserve the Association, but to effect an intentional, *de facto* liquidation?

---

[13]One challenged transaction was not an asset sale. Plaintiffs argue the RTC failed to timely exercise its statutory authority to repudiate burdensome high-interest bonds before it issued reports on FSA's capital which allegedly triggered the bonds' defeasance. *See* 12 U.S.C. § 1821(e)(1) (giving FDIC/RTC discretion, as conservator, to disaffirm or repudiate any burdensome contract if repudiation will promote orderly administration of institution's affairs). The RTC thus had statutory authority to perform the omitted act and discretion in exercising that authority. *See id.* Plaintiffs do not argue that the failure to repudiate breached any duty other than the general duty to conserve and not liquidate. That failure thus raises no issues distinct from those raised by the asset sales.

-20-

i.    *The purpose of the discretionary-function exception.*

At the Rule 12(b) stage, this court cannot simply disbelieve plaintiffs' factual allegations about RTC officials' intent, as the Government urges. Nonetheless, the purpose of the discretionary-function exception compels this court to reject plaintiffs' argument. The argument premises jurisdiction on an allegation that RTC employees *intentionally* undertook the forbidden function of liquidation rather than the mandated, discretionary function of conservation. The Supreme Court has repeatedly insisted, as discussed below, that FTCA claims are not vehicles to second-guess policymaking. That principle requires a federal court to dismiss an FTCA claim if jurisdiction is so dependent on allegations about government officials' intent or decisionmaking process that resolving the claim would require judicial inquiry into those subjective matters.

The Supreme Court has consistently relied on the purpose of the discretionary-function exception in defining its scope. *See Gaubert*, 499 U.S. at 322–26; *Berkovitz*, 486 U.S. at 536–39; *Varig*, 467 U.S. at 807–10, 813–14; *Dalehite v. United States*, 346 U.S. 15, 32–34 (1953). The Court has stressed that the main congressional purpose in creating the exception was to prevent litigants and courts from using FTCA actions as vehicles for "second guessing" executive-branch decisions based on public policy. *See Gaubert*, 499 U.S. at 323; *Berkovitz*, 486 U.S. at 536–37; *Varig*, 467 U.S. at 814; *see also* H.R. Rep. No. 77–2245, at 10

-21-

(1942) (discussing exception).  This court has repeated that statement of the exception's animating purpose in a dozen published opinions since *Varig*.[14]

Under the test first established in *Berkovitz*, the government must show that the challenged conduct involves discretion, and that the discretion is of the type Congress intended to protect.  Under *Berkovitz*, that meant an exercise of discretion "based on considerations of public policy."  486 U.S. at 537.  In *Gaubert*, the Court elaborated on *Berkovitz*, establishing a "strong presumption" that an employee who exercised discretion did so in accord with the policy considerations which led Congress or an agency to confer that discretion.  *See* 499 U.S. at 324.  The Court stressed that "[t]he focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred . . ., but on the nature of the actions taken and on whether they are susceptible to policy analysis."  *Id.* at 325; *see also Kiehn*, 984 F.2d at 1105 (discussing *Gaubert* and holding that "lack of record evidence of public policy factors in the . . . decision . . . is

_____

[14]*See Aragon v. United States*, 146 F.3d 819, 823 (10th Cir. 1998); *Bell v. United States*, 127 F.3d 1226, 1229 (10th Cir. 1997); *Richman v. Straley*, 48 F.3d 1139, 1147 (10th Cir. 1995); *Black Hills Aviation, Inc. v. United States*, 34 F.3d 968, 973 (10th Cir. 1994); *Kiehn v. United States*, 984 F.2d 1100, 1103 (10th Cir. 1993); *Tinkler v. United States*, 982 F.2d 1456, 1464 (10th Cir. 1992); *Ayala v. United States*, 980 F.2d 1342, 1347 (10th Cir. 1992); *Daigle*, 972 F.2d at 1538; *Daniels v. United States*, 967 F.2d 1463, 1464 (10th Cir. 1992); *Johnson*, 949 F.2d at 338; *Redmon ex rel. Redmon v. United States*, 934 F.2d 1151, 1156 (10th Cir. 1991); *Zumwalt v. United States*, 928 F.2d 951, 956 (10th Cir. 1991); *Allen v. United States*, 816 F.2d 1417, 1424 (10th Cir. 1987).  The foregoing opinions all quote or cite *Berkovitz*, 486 U.S. at 536–37, *Varig*, 467 U.S. at 814 or 820, or both, or refer without attribution to "second guessing."

immaterial" because "it is unnecessary for government employees to make an actual 'conscious decision' regarding policy factors" (quoting *Johnson*, 949 F.2d at 339)); *Daigle*, 972 F.2d at 1542 (applying presumption that exercise of discretion was based in policy despite allegation that officials "'rushed into [action] without proper planning'").

The Court's modification of the second branch of *Berkovitz* to ask whether an exercise of discretion was "susceptible to policy analysis" has lightened the Government's burden. The change has also served to emphasize that courts should not inquire into the actual state of mind or decisionmaking process of federal officials charged with performing discretionary functions. *See, e.g.,* Bruce A. Peterson & Mark E. Van Der Weide, *Susceptible to Faulty Analysis: United States v. Gaubert and the Resurrection of Federal Sovereign Immunity*, 72 Notre Dame L. Rev. 447, 464–69, 473 (1997) (counting pre- and post-*Gaubert* case outcomes to show that eliminating inquiry into actual decisionmaking has made it much easier to get FTCA claims dismissed); Richard H. Seamon, *Causation and the Discretionary Function Exception to the Federal Tort Claims Act*, 30 U.C. Davis L. Rev. 691, 708–10 (1997) (explaining how *Gaubert* has "made it even easier for the government to satisfy the second part of the [*Berkovitz*] test").

The *en banc* Third Circuit recently read *Gaubert* broadly to restrict all inquiry into officials' subjective decisionmaking. *See Fisher Bros. Sales v. United*

*States*, 46 F.3d 279, 285–87 (3rd Cir. 1995) (*en banc*) (7–6). *Fisher Brothers* concerned a different type of challenge to a discretionary decision than this case, but the court's reasoning in determining the type of inquiry that *Gaubert* bars is applicable.

The case involved the FDA Commissioner's indisputably discretionary decision to bar Chilean grapes from the United States. *See id.* at 282. The decision followed FDA scientists' allegedly negligent testing of grape samples, which falsely indicated cyanide. *See id.* at 282–83. The *en banc* court concluded that *Gaubert*'s rationale requires dismissal of FTCA claims if a protected exercise of discretion immediately caused the damages. *See id.* at 282, 286–87. The opinion requires dismissal even if plaintiffs disavow any challenge to the exercise of discretion itself. It thus bars suit for negligent performance of nondiscretionary data-gathering functions that preceded a discretionary decision, so long as the decision itself immediately caused the harm. *See id.* at 286–87. *See generally* Seamon, *supra*, at 722–52 (analyzing case).

Despite accepting plaintiffs' version of the facts and conceding that their claims were in a literal sense "based upon" the negligent testing rather than the Commissioner's decision, the court nonetheless rejected their theory of proximate cause as "inconsistent with the purpose of the discretionary function exception."

*Id.* at 286. The court relied on *Gaubert* to define the range of inquiry which that purpose forecloses:

> [W]here the injury . . . is caused by a regulatory policy decision, . . . there is no difference in the quality or quantity of the interference occasioned by judicial second guessing, whether the plaintiff purports to be attacking the data base on which the policy is founded or . . . challeng[es] the policy itself.
>
> If plaintiffs [could] . . . challeng[e] the manner in which the underlying data was collected, federal courts, of necessity, would be required to examine in detail the decisionmaking process of the policymaker to determine what role the challenged data played in the policymaking . . . . Without such an examination and all of the discovery that would necessarily precede it, a plaintiff . . . would be unable to prove a causal link between the alleged negligence and the alleged injury. Yet this is precisely the kind of inquiry that the Supreme Court sought to foreclose when it ruled out any inquiry into an official's "subjective intent in exercising the discretion conferred by statute or regulation."

*Id.* (quoting *Gaubert*, 499 U.S. at 325). [15]

The court held that policy compelled it to read *Gaubert* as an affirmative bar to any inquiry into officials' subjective decisionmaking: "[t]he social cost of permitting the inquiries required by the plaintiffs' theory are prohibitive." *Id.* The

---

[15]As a commentator has noted, there is in fact some difference in the "'quality'" of interference occasioned by judicial second-guessing if plaintiffs attack not the discretionary decision itself, but data-gathering that preceded it. *See* Seamon, *supra*, at 735–36 (quoting *Fisher Bros.*, 46 F.3d at 286). In the latter case, a court need not second-guess the decision's wisdom; it need only examine the decisionmaking process to determine whether the negligently produced data affected it. *See id.*

majority identified three types of social cost: (1) large tort judgments against the government; (2) demands on the time and attention of an agency's "most valuable human resources" when plaintiffs conduct discovery into the bases for officials' decisions; and (3) the cost, as Seamon puts it, "of having an official's exercise of discretion skewed by her desire to avoid the first two kinds of costs." *Id.* at 286–87; Seamon, *supra*, at 737. Those costs result whether a court examines the wisdom of the discretionary decision, or merely determines if negligent data-gathering affected it. *See* Seamon, *supra*, at 738–47; *Fisher Bros.*, 46 F.3d at 286–87.

Unlike a direct challenge to the exercise of a discretionary function, which the FTCA plainly bars, plaintiffs' theory would not require analysis of whether the RTC was negligent or abused its discretion while trying to perform the function of conservation. And unlike a *Fisher Brothers*–type claim, it would not require analysis of whether any particular data had affected the exercise of discretion. Plaintiffs' theory would instead require judicial inquiry into whether the RTC had in fact tried to perform the discretionary function of conservation, or had instead intentionally chosen to perform, *sub rosa*, the function of liquidation. While differing from a direct or a *Fisher Brothers*–type challenge, plaintiffs' theory would thus still require a court to permit discovery and make factual findings regarding RTC employees' state of mind and intent in running the Association. This the discretionary-function exception does not allow.

ii.     *Analogous doctrines limiting inquiry into officials'*
        *decisionmaking.*

Other doctrines applicable to official conduct support a reading of     *Gaubert*
as an affirmative bar to inquiry into officials' subjective intent and
decisionmaking.  One such doctrine is qualified immunity.     *See, e.g., Harlow v.*
*Fitzgerald* , 457 U.S. 800, 813–19 (1982) (discussing official immunity from suits
seeking damages for constitutional torts).

In *Harlow* , the Supreme Court revised the standard for motions to dismiss
based on the doctrine of qualified immunity.     *See id.* at 814–18.  The Court noted
it had crafted the doctrine as a compromise between the need to redress
constitutional harms and the need to minimize disruption of officials' duties.     *See*
*id.* at 813–14.  In so doing, it had assumed that qualified immunity "would permit
'[i]nsubstantial lawsuits [to] be quickly terminated.'"     *Id.* at 814 (quoting   *Butz v.*
*Economou* , 438 U.S. 478, 507–08 (1978)).  This would mitigate the costs to
society of frequent, unfounded claims against officials.  Those costs include not
only direct expenses of litigation, but "diversion of official energy from pressing
public issues, . . . deterrence of able citizens from acceptance of public office . . .
[and] danger that fear of being sued will 'dampen the ardor of all but the most
resolute, or the most irresponsible [public officials], in the unflinching discharge
of their duties.'"   *Id.* (quoting  *Gregoire v. Biddle*  , 177 F.2d 579, 581 (2d Cir.

1949) (L. Hand, J.)).  The direct, diversionary, and dampening costs are the same as those noted by the *Fisher Brothers* court in FTCA suits.  *See* 46 F.3d at 286–87.

Before *Harlow*, qualified immunity depended on both the objective reasonableness and subjective good faith of official conduct.  *See Harlow*, 457 U.S. at 815 (discussing *Wood v. Strickland*, 420 U.S. 308, 322 (1975)).  Good faith, a factual issue, proved unamenable to summary judgment.  *See id.* at 816 & n.27.  The *Harlow* Court thus concluded that "[t]he subjective element . . . has proved incompatible with our admonition in *Butz* that insubstantial claims should not proceed to trial."  *Id.* at 815–16.  The Court further explained that "substantial costs," beyond simply prolonging insubstantial claims, "attend the litigation of the subjective good faith of government officials."  *Id.* at 816.  Such litigation had proved peculiarly and broadly disruptive:

> There are special costs to "subjective" inquiries of this kind.
> Immunity generally is available only to officials performing
> discretionary functions. [16]  In contrast with the thought processes
> accompanying "ministerial" tasks, the judgments surrounding
> discretionary action almost inevitably are influenced by the
> decisionmaker's experiences, values, and emotions.  These variables
> explain in part why questions of subjective intent so rarely can be
> decided by summary judgment.  Yet they also frame a background in
> which there often is no clear end to the relevant evidence.  Judicial
> inquiry into subjective motivation therefore may entail broad-ranging

---

[16]The Court here used the term in its common-law sense, which distinguishes "discretionary" from "ministerial" acts, and not in its distinct but related FTCA sense.

discovery and the deposing of numerous persons, including an official's professional colleagues. Inquiries of this kind can be peculiarly disruptive of effective government.

*Id.* at 816–17 (footnotes omitted). To limit such disruption, the Court adopted a purely objective test for qualified immunity, holding that "bare allegations of malice should not suffice to subject government officials either to the costs of trial or to the burdens of broad-reaching discovery." *Id.* at 817–18.

The Court has since emphasized that qualified immunity entails a right to have suits dismissed at "the earliest possible stage of the litigation," sparing officials not only from liability but also from discovery and trial. *See Anderson v. Creighton*, 483 U.S. 635, 646 n.6 (1987) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (making denial of qualified immunity immediately appealable, lest right to avoid discovery and trial be lost)). [17] The Court recently held that the right to be free from discovery is sufficiently important to entitle a defendant to immediately appeal the denial of a Rule 12(b)(6) motion without sacrificing the right to immediately appeal a later denial of a summary-judgment motion. *See Behrens v. Pelletier*, 516 U.S. 299, 308 (1996) (rejecting one-appeal rule in part because " *Harlow* and *Mitchell* make clear that [qualified immunity] is meant to

---

[17]The Court has limited *Mitchell*, allowing immediate appeal only of denials of immunity turning on questions of law, not sufficiency of evidence. *See Johnson v. Jones*, 515 U.S. 304, 313 (1995), *lim'd in turn by Behrens v. Pelletier*, 516 U.S. 299, 312–13 (1996) (holding that genuine factual dispute does not preclude appeal of discrete ruling on pure legal issue).

give government officials a right, not merely to avoid 'standing trial,' but also to avoid the burdens of 'such pretrial matters as discovery . . ., as "[i]nquiries of this kind can be peculiarly disruptive of effective government."'" (quoting *Mitchell*, 472 U.S. at 526 (quoting *Harlow*, 457 U.S. at 817))). [18]

---

[18]As illustrated by the opinion establishing that municipalities do not share their employees' qualified immunity from § 1983 liability, the analogy between discretionary-function immunity, which limits governmental liability, and qualified immunity, which limits officials' personal liability, is imperfect. *See Owen v. City of Independence*, 445 U.S. 622, 650–58 (1980). The *Owen* Court declined to rely on qualified-immunity rationales to create a governmental immunity. *See id.* at 653–56. It opined that governmental liability is less likely than personal liability to "paralyz[e] the governing official's decisiveness and distort[] his judgment on matters of public policy." *Id.* at 655–56.

    *Owen*'s rejection of a qualified-immunity analogy in the § 1983 context is nonetheless irrelevant in construing the discretionary-function exception for several reasons. The *Owen* majority's tentative empirical speculation that governmental liability may not affect individual officials was *dictum* on which the Court did not rely, perhaps because the four dissenting Justices soundly and forcefully criticized the majority's passing comment to that effect. *Compare id.* at 656 (deeming "questionable" but not rejecting link between governmental liability and official timidity); *with id.* at 668–69 (Powell, J., dissenting). *Owen* ultimately relied not on an empirical rationale but a normative one: fear of governmental liability under § 1983 *should* lead officials to alter their decisionmaking to avoid infringing constitutional rights. *See id.* at 656. This holding is irrelevant in construing the FTCA, which does not protect constitutional rights that trump more mundane policy concerns. *Cf. id.* at 649–50 (rejecting analogy to municipal discretionary-function immunity as reason to create qualified municipal immunity under § 1983 because, in § 1983 action, court "does not seek to second-guess the 'reasonableness' of the city's decision" but only to determine if it violated federal Constitution or laws). The rule that courts must construe § 1983 broadly to serve its remedial purpose, on which *Owen* relied, has no parallel under the FTCA. *Compare id.* at 650 *with Smith v. United States*, 507 U.S. 197, 203 (1993) (disavowing "varying [past] statements as to how [the FTCA] should be construed" and adopting rule that courts "'should not take it upon ourselves to extend the waiver beyond that which Congress intended . . . [or] narrow the waiver that Congress intended.'") (quoting *United*

(continued...)

-30-

A ban on FTCA actions which require inquiry into officials' subjective decisionmaking also finds support by analogy to a "central tenet of administrative law." *See* Seamon, *supra*, at 743–44. The tenet is that courts should not "'probe the mental processes'" of administrative officials in APA or comparable review. *See United States v. Morgan*, 313 U.S. 409, 422 (1941) (quoting *Morgan v. United States*, 304 U.S. 1, 18 (1938)). In *Morgan*, Justice Frankfurter disapproved a court's decision to allow a party to interrogate a Cabinet Secretary "regarding the process by which he reached the conclusions of [a challenged] order, including the manner and extent of his study of the record and his consultation with subordinates." *Id.* The Court said that "the Secretary should never have been subjected to this examination." *Id.*; *see also, e.g.*, *Franklin Savings Ass'n v. Ryan*, 922 F.2d 209, 211–12 (4th Cir. 1991) (discussing breadth of *Morgan* doctrine and applying it to bar examination of former OTS Director regarding his decision to appoint conservator for FSA). Like *Harlow*'s purely objective test for qualified immunity, the *Morgan* doctrine "allow[s] officials to perform their duties without

[18](...continued)
*States v. Kubrick*, 444 U.S. 111, 117–18 (1979)). This court had at times said before *Smith* that "[e]xceptions to the FTCA are to be narrowly construed." *Johnson*, 949 F.2d at 336; *see also Miller v. United States*, 710 F.2d 656, 662 (10th Cir. 1983); *First Nat'l Bank in Albuquerque v. United States*, 552 F.2d 370, 376 (10th Cir. 1977); *Smith v. United States*, 546 F.2d 872, 877 (10th Cir. 1976). Such comments are no longer valid. Finally, *Owen* predated *Harlow*'s conclusion, made after further experience with qualified-immunity litigation, that an immunity doctrine must exclude "peculiarly disruptive" subjective inquiry if it is to protect governmental efficiency. *See* 457 U.S. at 817.

fear of harassment from lawsuits." Stephen G. Breyer & Richard B. Stewart,

*Administrative Law and Regulatory Policy: Problems, Text, and Cases* 868 (3d ed.

1992).

Unlike qualified immunity under *Harlow*, however, the *Morgan* rule has an

exception for cases involving "a strong showing of bad faith or improper

behavior." *See Community for Creative Non-Violence v. Lujan*, 908 F.2d 992, 997

(D.C. Cir. 1990) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S.

402, 420 (1971)). [19] At first blush, that exception may suggest that analogizing to

*Morgan* in the present case would support reversing the dismissal. A comparison,

however, of the purposes of and relief available under the APA and the FTCA

demonstrates that it is proper to allow judicial inquiry into subjective

decisionmaking in a small number of APA cases, but to preclude it in all FTCA

cases.

The APA's purpose is to authorize judicial scrutiny of executive-branch

decisionmaking, with two narrow exceptions; it created a "basic presumption of

---

[19]The *Morgan* rule has a second, very narrow exception for cases in which a lack of contemporary findings or other administrative record makes effective judicial review impossible without examining the decisionmaker. *See Community for Creative Non-Violence v. Lujan*, 908 F.2d 992, 997–98 (D.C. Cir. 1990) (citing *Overton Park*, 401 U.S. at 420); *see also Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 654 (1990) ("Subsequent cases have made clear that remanding to the agency [to explain its reasoning more fully] in fact is the preferred course").

judicial review." *See Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967) (construing 5 U.S.C. §§ 701–702). The FTCA's purpose, by contrast, is to remove sovereign immunity as a bar to compensating people hurt by federal employees' garden-variety common-law torts. *See Kosak v. United States*, 465 U.S. 848, 855 (1984); *Dalehite*, 346 U.S. at 28; Seamon, *supra*, at 739 n.195. Its purpose is not to facilitate judicial second-guessing of executive decisionmaking. Such second-guessing is, instead, the point of the APA, which Congress enacted in the same year as the FTCA. [20] Given the statutes' diametrically opposed yet complementary purposes, it is sensible to allow judicial inquiry into bad faith and subjective decisionmaking in a few exceptional cases under the APA, but to ban all FTCA suits that necessitate that peculiarly disruptive inquiry.

Treating bad-faith claims differently under the APA and FTCA also accords with the divergent remedies under the two statutes. The APA presumptively authorizes judicial review of almost all administrative acts. *See Abbott Labs*, 387 U.S. at 140; *see also Block v. Community Nutrition Inst.*, 467 U.S. 340, 349 (1984); *Overton Park*, 401 U.S. at 410. As a concomitant of that broad applicability, Congress has limited the relief available under the APA by waiving sovereign immunity only as to suits "seeking relief other than money damages." 5

---

[20]*See* Act of June 11, 1946, ch. 324, 60 Stat. 237 (APA) (codified as amended at 5 U.S.C. §§ 701–706); Legislative Reorganization Act of 1946, Pub. L. No. 79–601, tit. IV, 60 Stat. 812, 842 (1946) (FTCA) (codified as amended at 28 U.S.C. §§ 1346(b), 2671–2680).

U.S.C. § 702. The *raison d'etre* of the FTCA, by contrast, is to waive sovereign immunity to suits seeking relief via money damages.

The possibility of damage awards creates a strong incentive to bring FTCA claims. *See* Ronald A. Cass, *The Discretionary Function Exception to the Federal Tort Claims Act*, *in* 2 Administrative Conf. of the United States, *Recommendations and Reports* 1503, 1519–27 (1987). This incentive, absent in APA suits, suggests the need for a stricter limit on FTCA litigants' ability to require federal courts to scrutinize officials' subjective decisionmaking. The discretionary-function exception provides that limit. The exception must bar all suits dependent on allegations of subjective bad faith if it is to serve its purposes: to protect the separation of powers and executive-branch efficiency from the disruptive discovery and judicial scrutiny that would result if large potential damage awards produced numerous suits, and those suits could not be summarily dismissed because of the factual nature of intent and good faith. Because the APA averts the threat of numerous suits by excluding damages, the narrow bad-faith exception to the rule against examining subjective decisionmaking poses no such risk. [21]

Both *Harlow* and *Morgan* thus support the view that *Gaubert* should bar any FTCA claim for which jurisdiction necessarily depends on an employee's bad faith

---

[21]Because review of bad faith may be available under the APA, moreover, a refusal to permit such inquiry in FTCA suits will not leave all plaintiffs without remedy. *See* Seamon, *supra*, at 741 & n.204.

or state of mind in performing facially authorized acts. In this case, the RTC's statutory powers as conservator authorized all the acts which plaintiffs challenge as a liquidation. Those acts, if done in good faith, entailed an exercise of discretion. Without probing RTC officials' intent and good faith, there is no way ultimately to determine whether their acts constituted a covert, intentional liquidation or an effort, perhaps negligent, at conservation.

Faced with the related question whether an official's acts, if allegedly done in bad faith, can still be within his or her scope of duty for purposes of official immunity, the Supreme Court acknowledged the argument that "'official powers, since they exist only for the public good, never cover occasions where the public good is not their aim, and hence . . . to exercise a power dishonestly is necessarily to overstep its bounds.'" *Barr v. Matteo*, 360 U.S. 564, 572 (1959) (quoting *Gregoire*, 177 F.2d at 581). After a "moment's reflection," the Court rejected that theory in light of the immunity doctrine's purpose:

> "[T]hat cannot be the meaning of the [scope-of-duty] limitation without defeating the whole [official-immunity] doctrine. What is meant by saying that the officer must be acting within his power [to enjoy official immunity for his acts] cannot be more than that the occasion must be such as would have justified the act, if he had been using his power for any of the purposes on whose account it was vested in him."

*Id.* (quoting *Gregoire*, 177 F.2d at 581). The same is true of the FTCA's requirement that an official be engaged in performing a discretionary function in

order to preserve sovereign immunity.  What is meant by saying that the officer must be performing a discretionary function cannot be more than that the discretionary function would have justified the act, if the official had been exercising discretion in good faith for any of the purposes on whose account that discretion was vested in the official.    Immunity doctrines can not function well if mere allegations of bad faith will penetrate them and require trial, or at least sufficient discovery to allow summary judgment, rather than dismissal under Rule 12(b)(6).  *Cf. Behrens* , 516 U.S. at 508 (noting officials' right to rely on Rule 12(b)(6) to avoid pre–summary judgment discovery, not just trial, in construing qualified-immunity doctrine).

   iii.  *Conclusion.*

  The inquiry necessary to decide whether this case involved "negligent, good-faith conservation" or "intentional, bad-faith liquidation" would entail the type of judicial second-guessing which led the   *Gaubert* Court to hold that courts need not consider officials' actual decisionmaking in FTCA cases.    *See* 499 U.S. at 325.  Such an inquiry would impose the same social costs which the Court presumably considered in  *Gaubert* , which the Third Circuit discussed in extending *Gaubert* to bar claims that require even noncritical examination of discretionary decisionmaking, and which the Supreme Court discussed in adopting a purely

objective standard for qualified immunity.    *See Fisher Bros.*  , 46 F.3d at 286–87; *Harlow* , 457 U.S. at 814–17.

A rule requiring dismissal of FTCA claims which necessarily turn on employees' intent or subjective bad faith has one potentially troubling effect. It amounts to an irrebuttable presumption that an employee ordered or required by law to perform a discretionary function, and whose acts are facially consistent with that function, did try in good faith to perform it. That irrebutable presumption will inevitably compel dismissal in cases, hopefully rare, in which an official intentionally ignored or subverted a duty, but not in a way discernible from his or her objective acts or omissions. To note this unavoidable cost is to invoke Learned Hand's "classic statement of the rationale for official immunity":

> "[A]n official, who is in fact guilty of using his powers to vent his spleen upon others, or for any other personal motive not connected with the public good, should not escape liability for the injuries he may so cause; and, if it were possible in practice to confine such complaints to the guilty, it would be monstrous to deny recovery. The justification for [denying recovery] is that it is impossible to know whether the claim is well founded until the case has been tried, and that to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties. Again and again the public interest calls for action which may turn out to be founded on a mistake, in the face of which an official may later find himself hard put . . . to satisfy a jury of his good faith. There must indeed be means of punishing public officers who have been truant to their duties; but that is quite another matter from exposing such as

-37-

have been honestly mistaken to suit by anyone who has suffered from their errors. As is so often the case, the answer must be found in a balance between the evils inevitable in either alternative. In this instance it has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation."

Richard H. Fallon, Jr., et al., *Hart & Wechsler's The Federal Courts and the Federal System*, 1165 (4th ed. 1996) (quoting *Gregoire*, 177 F.2d at 581).

        c.      The RTC did not engage in nongovernmental activity in commerce barring a conclusion that it exercised the sort of discretion the exception protects.

Plaintiffs' final FTCA argument addresses the second branch of *Berkovitz* by invoking the Supreme Court's recent decision in *United States v. Winstar Corp.*, 518 U.S. 839 (1996). Under *Winstar*, plaintiffs argue, the Government ceases to exercise discretion of the sort protected by the FTCA, and thus forfeits its sovereign immunity, when it enters commerce to perform such activities as managing a savings-and-loan association. *See id.* at 895. *Winstar*, however, concerns the United States' contractual obligations, not its tort liability. It is thus inapplicable. *Winstar* concerned thrifts' attempts to enforce regulatory contracts with the United States. *Id.* at 843–44. The Court observed that "'[w]hen the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals.'" *Id.* at 895 (quoting *Lynch v. United States*, 292 U.S. 571, 579

(1934)).  In a footnote the Court also quoted its ancient observation that "when the United States 'comes down from its position of sovereignty, and enters the domain of commerce, it submits itself to the same laws that govern individuals there.'" *Id.* at 895 n.39 (quoting *Cooke v. United States*, 91 U.S. 389, 398 (1875)).  That footnote, however, did not change, direct, or compress the scope of the discretionary-function exception for tort claims.  Nor did it implicitly overrule the central premise of *Gaubert*: oversight of financial institutions generally entails discretion of the sort protected by the exception.  *See* 499 U.S. at 324–25.

C.    The FTCA Bars Plaintiffs' Tort Claims Asserted Directly Against the FDIC.

The FDIC's organic statute empowers the FDIC "to sue and be sued in its corporate capacity."  12 U.S.C. § 1441a(b)(9)(E).  The district court rejected plaintiffs' theory that this section entitled them to bring tort claims directly against the FDIC, regardless of the limits in the FTCA.  *See Franklin III*, 970 F. Supp. at 868.  The court aptly quoted the Supreme Court's recent holding that,

> "In order to place torts of 'suable' agencies . . . upon precisely the same footing as torts of 'nonsuable' agencies, Congress, through the FTCA, limited the scope of sue-and-be-sued waivers such as that contained in [the FDIC's] organic statute."  Specifically, Congress stated [in the FTCA]:
>
>> The authority of any federal agency to sue and be sued in its own name shall not be construed to authorize suits against such federal agency on claims which are cognizable under [the FTCA, 28 U.S.C. § 1346(b)], and

-39-

the remedies provided by [the FTCA] in such cases shall be exclusive.

28 U.S.C. § 2679(a). "Thus, if a suit is 'cognizable' under § 1346(b) of the FTCA, the FTCA remedy is 'exclusive' and the federal agency cannot be sued 'in its own name,' despite the existence of a sue-and-be-sued clause."

*Id.* (quoting *FDIC v. Meyer*, 510 U.S. 471, 476 (1994) (first alteration in *Meyer*) (citation omitted from *Meyer*)). The court further correctly explained that plaintiffs' suit is "cognizable" under § 1346(b): it is a straightforward State-law tort suit. *See id.* (citing *In re Cedar Vale State Bank*, 894 P.2d 816 (Kan. 1995) (recognizing claim against bank receiver)). The court also rejected the argument, which plaintiffs repeat on appeal, that "if the tort claim against the United States fails because of the discretionary function exception, it is not cognizable under § 1346(b) and the RTC is subject to the tort claim under its sue-and-be-sued [clause]." *See id.* As the district court correctly noted, this argument would make the discretionary-function exception a meaningless rule of pleading: "Litigants could avoid the force of the statute merely by suing an agency directly." *Id.* Plaintiffs add no persuasive authority to their theory on appeal. This court affirms the dismissal of their common-law tort claims against the FDIC for substantially the reasons stated in the district court's opinion.

IV. CONCLUSION

This court **AFFIRMS** the dismissal of all claims for lack of subject-matter jurisdiction.