**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

PETER CLARK,

     Plaintiff - Appellant,

v.

UNITED STATES OF AMERICA,

     Defendant - Appellee.

_____

AILEEEN O'CATHERINE; STEVEN
SILVER, individually and as parents and
next friends of Noah Silver, a minor,

     Plaintiffs - Appellants,

v.

UNITED STATES OF AMERICA,

     Defendant - Appellee.
_____

No. 15-2113
(D.C. No. 1:12-CV-01160-MV-KBM)
(D. N.M.)

No. 15-2114
(D.C. No. 1:12-CV-01176-MV-KBM)
(D. N.M.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **BRISCOE**, **LUCERO**, and **PHILLIPS**, Circuit Judges.
_____

    [*] After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

_____

In these consolidated cases, the Plaintiffs seek damages against the United States under the Federal Tort Claims Act (FTCA) for serious injuries sustained while sledding at the Capulin Snow Play Area, a recreational area managed by the United States Forest Service within the Cibola National Forest. The Plaintiffs allege that the Forest Service's negligence caused their injuries. Concluding that the FTCA's discretionary-function exception applied, the district court granted the United States' motion to dismiss their complaints for lack of subject-matter jurisdiction. The Plaintiffs appeal, and we affirm.

## BACKGROUND

The district court made the following pertinent factual findings:

> The Capulin Snow Play Area was constructed in direct response to numerous snow play and traffic injuries that had occurred along the highways [in the Cibola National Forest], where members of the public found unofficial and unsafe sites to engage in snow play activities. The purpose of the area was to provide a safer alternative for snow play and to reduce extensive use of roadsides for snowplay activities, which is extremely dangerous and many serious accidents had occurred in the past. The slope of the Capulin Snow Play Area followed the natural slope of the hill. The Forest Service decided to operate Capulin without supervision, due to limited funding, and it continued to be operated without supervision at all relevant times. Improvements made to the area in 1989 and the early 1990's did not alter the snow play slopes. Neither the slope of the snow play area nor the run out had been altered at the time of the events in question.

> At all material times, the Forest Service posted at the entrance/pay station and made flyers available to the public notifying visitors that the area was operated with minimal supervision – to participate at [their] own discretion and risk. Additionally, signs and flyers advised the public of safety rules, specifically directing the public to be aware of the elements of risk in snow play activities, observe signs and warnings, look around before

2

starting down the hill, and maintain control in order to avoid people and objects. Signs also informed the public that it was the individual sledder's responsibility to avoid collisions.[1]

The Forest Service visited the Capulin Snow Play Area on a daily basis when the facility was scheduled to be open to assess the amenities and

---

[1] The Plaintiffs argue that "[t]he signage in this case merely read 'No Snow Patrol on Duty, Play at Your Own Risk,'" Aplt. Opening Br. at 25, and that "these signs do not even remotely warn of the hazards present at the recreational area, nor do they comply with the [Forest Service Manual] mandates," *id.* at 33. In their response to the United States' motion to dismiss or for summary judgment, however, the Plaintiffs admitted that the following signs were present:

First, there was "one sign in the parking lot adjacent to a path leading to the sledding slopes and this sign stated, 'No Snow Patrol on Duty. Play at your Own Risk.'" Aplt. App., Vol. 2 at 172. The Plaintiffs claimed that at the time of Mr. Clark's accident, this sign was obscured by snow and jackets that had been hung on the sign.

Second, there were two other signs that read as follows:

CAPULIN SNOWPLAY AREA
For your safety follow these rules
- Slide on approved devices only
  Allowed: innertubes, plastic discs & plastic sleds
  Not allowed: Anything with metal or wood
  For your safety no trains two people max per tube or toy
- No glass containers on slopes
- No alcohol on slopes
- Do not make or use jumps
- Keep pets on leash and under control
- Be considerate of others
- Look before you slide

*Id.*

In addition, it appears undisputed that "flyers were made available notifying visitors that the area is operated with minimal supervision—to 'participate at your own discretion and risk.'" *Id.*, Vol. 1 at 63.

observe the conditions of the slope. During the daily visit, the Forest Service cleared trash, removed or mitigated large human-made jumps and natural moguls, checked general snow conditions, and determined whether to open the area to the public for that day.

In October 2007, an Environmental Assessment was undertaken at Capulin. The Assessment states that the sliding areas at Capulin were too steep allowing too much speed and created unsafe and hazardous conditions for the public. Although the Forest Service began planning to renovate Capulin as early as 2005, due to competing demands on Forest Service resources, renovation did not begin until May 2010.

On January 31, 2010, Plaintiff Peter Clark sustained serious injuries to his back and ankle while sledding with his son at the Capulin Snow Play Area. Additionally, on December 27, 2009, Noah Silver, the 12 year-old child of Plaintiffs Aileen O'Catherine and Steven Silver, sustained spinal cord injuries resulting in partial paralysis, a need for multiple surgeries, and other serious life changing injuries while sledding at the Capulin Snow Play Area. As a result of his injuries, Plaintiff Clark filed, under the Federal Tort Claims Act ("FTCA"), a Complaint for Personal Injury on November 12, 2012, alleging a negligence claim against the United States. Similarly, as a result of Noah's injuries, Plaintiffs O'Catherine and Silver filed, under the FTCA, a Complaint for Personal Injury and Loss of Consortium on November 15, 2012, alleging both a negligence claim and a claim for loss of consortium against the United States.

In their Complaints, Plaintiffs allege that the Forest Service breached its duty to exercise ordinary care such that the Capulin Snow Play Area was reasonably safe for public use and its duty to warn the public of hidden dangers. In support of those allegations, Plaintiffs specifically allege that the Capulin Snow Play Area was operated without supervision; the man-made pitch to the sled area allowed sleds to travel at an unsafe speed and contained insufficient "run out" to allow sleds to safely slow down and stop; and Forest Service employees knew that the public was violating the rules for use and occupancy of the area.

Aplt. App., Vol. 2 at 201-03 (brackets, ellipses, and internal quotation marks omitted).

The United States filed a motion to dismiss the complaints or for summary judgment on the merits of the Plaintiffs' claims. Alternatively, it moved under

4

Fed. R. Civ. P. 12(b)(1) to dismiss the complaints for lack of subject-matter jurisdiction. The district court denied the government's merits motion but granted the motion to dismiss for lack of subject-matter jurisdiction. The Plaintiffs then moved for reconsideration, which the district court also denied.

## DISCUSSION

### 1. Appellate Jurisdiction

On September 25, 2014, the district court entered its final judgment of dismissal. On October 15, 2014, the Plaintiffs filed a timely "Motion for Clarification and Motion for Reconsideration of Order Granting Summary Judgment, For Relief From Judgment, or to Alter or Amend the Judgment" (Motion for Reconsideration), seeking relief under Fed. R. Civ. P. 59 and 60. On June 29, 2015, the district court denied the Motion for Reconsideration, which it treated as a motion filed under Fed. R. Civ. P. 59(e). The Plaintiffs had 60 days from that date to appeal from either the denial of their Motion for Reconsideration, the district court's underlying judgment, or both. *See* Fed. R. App. P. 4(a)(1)(B); 4(a)(4)(A)(v), (vi).

On July 30, 2015, the Plaintiffs timely filed their notices of appeal, within the 60-day time limit. But these notices designated only the district court's order of June 29, 2015. Thus, the notices did not preserve an appeal from the district court's underlying judgment of September 25, 2014. *See* Fed. R. App. P. 3(c)(1)(B) (stating notice of appeal must "designate the judgment, order, or part thereof being appealed").

5

But on August 13, 2015, still within the 60-day appellate window from the district court's order of June 29, 2015, the Plaintiffs filed docketing statements in this court, giving notice under Fed. R. App. P. 3 that they intended to appeal from the September 25 judgment. We will treat the docketing statements as the functional equivalent of an amended notice of appeal. *See B. Willis CPA, Inc. v. BNSF Ry. Corp.*, 531 F.3d 1282, 1296 (10th Cir. 2008) (treating amended docketing statement as functional equivalent of second notice of appeal); *see also Ayala v. United States*, 980 F.2d 1342, 1344 (10th Cir. 1992) ("We have recognized that a docketing statement . . . filed within the period allotted for filing a notice of appeal may cure defects in the notice of appeal."). Thus, we conclude that we have jurisdiction to review both the district court's underlying judgment and the denial of the Plaintiffs' motion for reconsideration.

**2. Standards of Review**

"We review the district court's dismissal for lack of subject matter jurisdiction *de novo*, and its findings of jurisdictional facts, if any, for clear error." *Esposito v. United States*, 368 F.3d 1271, 1273 (10th Cir. 2004). "Rule 12(b)(1) motions can take the form of either a facial or a factual attack on the court's subject matter jurisdiction." *Ingram v. Faruque*, 728 F.3d 1239, 1242 (10th Cir. 2013) (internal quotation marks omitted). "Where the party challenging subject-matter jurisdiction mounts a facial attack, the district court must accept the allegations in the complaint as true." *Id.* (internal quotation marks omitted). "But if the challenging party brings a factual attack by going beyond allegations contained in the complaint . . . , the court

6

has wide discretion to [consider materials outside the complaint] to resolve disputed jurisdictional facts." *Id.* (brackets, ellipsis, and internal quotation marks omitted). Here, in reaching its decision, the district court considered materials outside the pleadings, including affidavits and documents attached to the government's motion.[2] We have considered these materials as well in exercising our review.

We review a court's decision regarding a Rule 59(e) motion to reconsider for an abuse of discretion. *Phelps v. Hamilton*, 122 F.3d 1309, 1324 (10th Cir. 1997).

_____

[2] Where a court considers materials outside the complaint to resolve a Rule 12(b)(1) motion, its reference to such evidence ordinarily does not convert the motion to one for summary judgment under Fed. R. Civ. P. 56. But an exception arises where resolution of the jurisdictional question is intertwined with the merits of the case. In such cases, a court considering evidence outside the pleadings is required to convert a Rule 12(b)(1) motion to dismiss into a summary judgment motion. *Pringle v. United States*, 208 F.3d 1220, 1223 (10th Cir. 2000). "We have stated, in a number of cases involving the discretionary function exception to the FTCA, that the determination of whether the FTCA excepts the government's actions from its waiver of sovereign immunity involves both jurisdictional and merits issues." *Id.* (internal quotation marks omitted). "Accordingly, [such a] case should [be] decided on summary judgment rather than as a 12(b)(1) motion to dismiss." *Id.*; *see also Garcia v. United States Air Force*, 533 F.3d 1170, 1176 (10th Cir. 2008) (treating motion to dismiss involving discretionary function exception as summary judgment motion where jurisdictional question was intertwined with merits of case).

Here, however, neither party argues that this case should have been resolved under a summary-judgment analysis, or that we should apply the summary-judgment standard of review. Nor does either party point to specific disputes of material fact involving merits issues that require resolution under a summary-judgment analysis. Accordingly, we need not consider whether the motion to dismiss should have been converted to a motion for summary judgment. *Cf. Lopez v. United States*, 376 F.3d 1055, 1061 (10th Cir. 2004) (rejecting plaintiffs' argument that district court should have converted Rule 12(b)(1) motion into motion to dismiss or for summary judgment, where specific factual disputes identified by plaintiffs were immaterial to applicability of discretionary function exception, and where, even drawing all inferences in plaintiffs' favor, discretionary function exception applied).

### 3. The Discretionary Function Exception

The FTCA authorizes suits against the United States for damages that arise out of

> injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1).

"Excluded from this waiver of immunity are claims based on the performance of 'a discretionary function or duty on the part of a federal agency or an employee of the Government.'" *Garcia v. United States Air Force*, 533 F.3d 1170, 1175 (10th Cir. 2008) (quoting 28 U.S.C. § 2680(a)). "This discretionary function exception poses a jurisdictional prerequisite to suit, which the plaintiff must ultimately meet as part of his overall burden to establish subject matter jurisdiction." *Id.* (internal quotation marks omitted).

"To determine whether conduct falls within the discretionary function exception, we apply the two-part test set forth by the Supreme Court in *Berkovitz [ex rel. Berkovitz] v. United States*, 486 U.S. 531, 536 . . . (1988)." *Id.* at 1176. The discretionary function exception applies only if both elements of the test are met. *See id.*

> First, we ascertain the precise governmental conduct at issue and consider whether that conduct was discretionary, meaning whether it was a matter of judgment or choice for the acting employee. Conduct is not discretionary if a federal statute, regulation, or policy specifically prescribes a course of

8

action for an employee to follow. In this event, the employee has no rightful option but to adhere to the directive.

If the first element of the *Berkovitz* test is satisfied, we then consider the second element—whether the decision in question is one requiring the exercise of judgment based on considerations of public policy. In so doing, we do not consider the employee's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis.

*Id.* (internal quotation marks omitted).

## A. First Part of *Berkovitz* Test

Concerning the first part of the test, the Plaintiffs cite a number of sections of the Forest Service Manual (FSM) which they contend created mandatory duties to address the known hazardous conditions (i) by correcting the conditions, (ii) closing the affected areas, or (iii) adequately warning about the hazards.[3] The district court

---

[3]   These sections include the following:

**2330.3 – Policy**

The basic recreation policies set forth at FSM 2303 and the following supplementary policies shall govern the development and administration of sites and facilities. Where it is not possible to achieve the objectives to the degree defined in this chapter, close sites and facilities to public use.

1. Use recreation opportunity spectrum guidelines . . . when developing sites.

2. Develop sites and facilities that will provide recreation experiences toward the primitive end of the spectrum. Do not provide urban class facilities. . . .

3. Use the land and resource management planning process . . . to reach decisions to develop recreation sites.

4. Develop sites and facilities to enhance natural resource-based activities normally associated with a natural environment.

(continued)

5. Seriously consider the element of cost efficiency when developing and operating sites and facilities.

6. Establish priorities for the development and management of sites in the following order:

> a. Ensure public health and safety.

> b. Protect the natural environment of the site.

> c. Manage and maintain sites and facilities to enhance users' interaction with the natural resource.

> d. Provide new developments that conform to the National Forest System recreation role.

> . . .

Aplt. App., Vol. 2 at 132-33.

### 2331.1 – Regulations and Orders

Clearly notify the public of the necessary conditions of occupancy and use at each individual site. Signs must be positive in tone and explain the reasons for the regulations.

Initiate firm action against those who knowingly, willfully, or persistently violate the conditions of occupancy and use. . . . Establish prohibitions by orders only where there is a demonstrated need and review them on an annual basis.

*Id.* at 134.

### Section 2331.5 – Site Closures

There are two types of site closures: permanent and temporary.

> 1. Monitor sites to determine whether it is desirable to continue operation of the site or to close the site. As part of this monitoring, consider:

> > a. The relationship of the site to other Forest Service sites. Are there other sites nearby that could satisfactorily serve the need?

(continued)

10

b. The relationship of the site to other Federal, State, local, or private sites. Could the private sector satisfactorily serve the need?

c. Other alternative recreation opportunities.

d. Total overall cost/benefit relationships. Although many variables affect the costs of operating and maintaining sites, carefully consider keeping sites open when cost per visitor-day exceeds $1.50.

2. Make every effort to stretch funds as far as possible to keep needed sites and facilities open to public use. As part of this effort, consider:

a. Temporary or seasonal closures.

b. The use of volunteer and other human resource programs to staff and maintain sites.

c. User cooperation in keeping areas clean and sanitary. . . .

d. The users' health and safety and level of resource damage.

3. Establish priorities under reduced funding levels by closing lesser-used sites and those sites that have alternative facilities nearby first. Also consider reducing service or closing the site during the lesser-used portions of the week or season before full closure of the site.

4. When sites are closed temporarily, install signs explaining why the site is closed and giving directions to the nearest available facilities.

5. Close the site or facility when conditions reach the point that users' health or safety is jeopardized or unacceptable resource damage is occurring. . . .

*Id.* at 135-36.

### Section 2332.1 – Public Safety

To the extent practicable, eliminate safety hazards from developed recreation sites. Inspect each public recreation site annually before the beginning of the managed-use season. Maintain a public record of the inspections and corrective actions taken with a copy of the operation and maintenance plan.

(continued)

determined that none of these guidelines created a mandatory duty because none of

them required that a snow play area be maintained in any particular way.

The Plaintiffs complain that in reaching this conclusion, the district court

ignored their argument that FSM 1110.3 and 1110.8 govern the interpretation of the

FSM and clarify that it prescribes mandatory duties.  These sections read as follows:

> When a directive is issued . . . it is the use of the helping verbs "must,"
> "shall," "ought," "should," or "may," or the use of the imperative mood
> (where "you" is understood) that determines the force and effect of the
> direction . . . . Refer to FSM 1110.8 for guidance on the degree of
> compliance and restriction imposed by helping verbs and imperative mood.

FSM 1110.3(3), Aplt. App., Vol. 2 at 151.

> Directive authors must choose verbs carefully to ensure that the degree of
> compliance is consistent with principles and guidelines for direction at
> FSM 1111.1 and 1112.1.
>
> Exhibit 01 explains the degree of compliance as conveyed by various
> "helping verbs" as well as by use of the imperative mood.

FSM 1110.8, Aplt. App., Vol. 2 at 152.

Exhibit 01, referred to in FSM 1110.8, describes the mandatory or permissive

effect of various helping verbs used in the FSM, including "must, shall," "should,

---

> Immediately correct high-priority hazards that develop or are identified
> during the operating season or close the site.

*Id.* at 137.

> **Section 2333.32 – Site Capacity**
>
> Ensure that the capacity of the site matches the desired recreation
> opportunity spectrum class and the ability of the site to withstand use.

*Id.* at 138.

ought," "may not," "may only," "may," "will," and "can." *Id.* at 153. Additionally,

it provides the following guidance concerning the use of imperative verb forms:

| Mood of Verb | Degree of Compliance or Restriction |
| --- | --- |
| imperative | Direction written with a verb in the imperative mood is also mandatory. For example: "Ensure cost-efficient delivery of services." In this sentence, the missing subject is understood to be "you" and the direction ("ensure cost-efficient delivery of services") is a direct command meaning "you shall ensure." The verb "ensure", is in the imperative mood. Where there are multiple audiences of a directive (such as line officers and staff officers), use of the imperative verb is appropriate only if it applies to all segments of the audience." |

*Id.*

These rules for the use of helping verbs and the imperative verb form are not

dispositive in determining whether the cited FSM sections specifically prescribe a

course of action for Forest Service employees to follow. This becomes clear when

we consider the example provided above in FSM 1110.8: to "*[e]nsure* cost-efficient

delivery of services." *Id.* at 153 (emphasis added). Though the imperative form of

the verb "to ensure" is deemed "mandatory" under section 1110.8, the phrase used

actually describes a *discretionary* duty under the FTCA. This is because the

language does not prescribe a specific course of action for employees to follow.

Instead, it requires the use of discretion to determine how to deliver services in a

cost-efficient manner.

13

Certainly, the Plaintiffs need to point to regulatory language that mandates a course of action to avoid the first part of the discretionary-function exception. But the mere use of verb forms that indicate mandatory action is insufficient as a matter of law for us to infer a non-discretionary function. Where the regulatory language "mandates" the consideration of alternatives, the weighing of factors, or the application of policy priorities bounded by practical concerns, the language leaves to the decisionmaker's discretion how best to fulfill such "mandatory" priorities. A regulatory requirement's mere use of the imperative form of a verb does not take it outside the exception.

Analyzing the particular sections of the FSM relied upon by the Plaintiffs, we conclude, for the reasons stated by the district court, *see* Aplt. App., Vol. 2 at 214-22, that the record reveals no regulation or policy that prescribes the Forest Service to follow a specific course of action in maintaining and supervising the Capulin snow play area. This is true even when we consider the use of verbs that imply mandatory action, as explained in FSM 1110.3 and 1110.8.

But we see one specific duty prescribed in the FSM that requires further specific discussion. Section 2332.1 requires that the Forest Service annually inspect of its recreational sites, and maintain a public record of the inspections. The district court analyzed this section as follows:

> Section 2332.1 also directs the Forest Service to inspect annually its recreation sites, before the beginning of the "managed use season," and to maintain a public record of those actions. Plaintiffs argue that these directives are mandatory, and that the Forest Service failed to comply with these directives. This argument, however, misses the point, as the conduct

14

alleged to be negligent and to have caused injury to Noah and Mr. Clark is unrelated to its failure to conduct or maintain records of annual inspections. Because any failure of the Forest Service to perform its mandatory duties regarding annual inspections did not give rise to Plaintiffs' claims, the provisions of Section 2332.1 related to annual inspections is inapplicable to the Court's determination of the applicability of the discretionary function exception.

Aplt. App., Vol. 2 at 221.

The Plaintiffs argue that the district court's causation analysis was inappropriate at this stage. They contend that a "focus on remoteness and foreseeability is not relevant to this Court's analysis under the discretionary function exception." Aplt. Opening Br. at 39. But this argument misperceives the district court's point.

To circumvent the discretionary function exception, the mandatory duty alleged must be one whose breach bears a causal relationship to the Plaintiffs' injuries, thereby giving rise to their cause of action against the government. *See, e.g.*, *Franklin Savings Corp. v. United States*, 180 F.3d 1124, 1132-33 (10th Cir. 1999) (stating FTCA complaint did not avoid discretionary function exception where, assuming directive to prepare case memoranda weighing alternatives created mandatory duty, complaint failed to "attribute any harm to the breach of a specific mandate to draft memoranda, as opposed to a failure to perform the discretionary function of weighing options"); *cf. Berkovitz*, 486 U.S. at 537 ("[T]he discretionary function exception insulates the Government from liability *if the action challenged in the case* involves the permissible exercise of policy judgment." (emphasis added)).

15

The Plaintiffs have not demonstrated that the Forest Service's failure to annually inspect or to maintain public records of those inspections caused their injuries. Even if the inspections might have revealed dangerous conditions, as the district court explained the Plaintiffs have identified only a *discretionary* duty or function to determine specifically how to remediate those specific conditions and thereby potentially avert their injuries. The district court therefore properly concluded that the duty to perform and document annual inspections did not give rise to a viable FTCA claim.

## B. Second Part of *Berkovitz* Test

The existence of a regulation that allows a government employee discretion "creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations." *United States v. Gaubert*, 499 U.S. 315, 324 (1991). In other words, "[w]hen established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Id.* As the district court explained, the presumption arose here and has not been rebutted.

For substantially the reasons stated in its well-reasoned decision, *see* Aplt. App., Vol. 2 at 222-27, we affirm the district court's determination that the second element of the discretionary function test has been satisfied. Only the Plaintiffs'

16

claim that the Forest Service had a duty to provide further warnings than it did requires further discussion.

A number of our cases have held that the government's justification for failing to warn of known hazards in national parks, recreational areas, or wilderness areas did not satisfy the second element of the discretionary-function test. *See, e.g.*, *Duke v. Dep't of Agriculture*, 131 F.3d 1407, 1412 (10th Cir. 1997) ("At this stage the government has not shown how failure to warn or protect from the danger of a boulder rolling down the man-made slope implicated political, social, or economic decisions of the sort that the exception was designed to protect." (internal quotation marks omitted)); *Boyd v. United States*, 881 F.2d 895, 898 (10th Cir. 1989) ("An alleged failure to warn swimmers of dangerous conditions in a popular swimming area does not implicate any social, economic, or political policy judgments with which the discretionary function exception properly is concerned. The government's alleged omission in this case simply does not involve the exercise of such judgment." (internal quotation marks omitted)); *Smith v. United States*, 546 F.2d 872, 877 (10th Cir. 1976) ("A policy decision to designate certain areas as 'undeveloped' ones may reasonably entail the omission of boardwalks, trails or footpaths and signs marking such ways. [But] it does not follow that the Government, as a landowner, is absolved of all duty under state law to erect safety devices or signs cautioning about conditions which have been left undisturbed as a policy matter.").

Other duty-to-warn cases, however, have found the second element satisfied. *See, e.g.*, *Elder v. United States*, 312 F.3d 1172, 1183 (10th Cir. 2002) ("The Middle

Emerald Pools is not a parking lot, but a scenic attraction. . . . Although some warning signs may be necessary, their number, size, and even content must be measured against the very purposes of a national park, which include to conserve the scenery and provide for public enjoyment." (internal quotation marks omitted)); *Kiehn v. United States*, 984 F.2d 1100, 1104-05 (10th Cir. 1993) ("[T]he decision not to place additional warnings at the petroglyph site, whether explicit or implicit, was part of the overall policy objective set forth in the [Park Service] Management Policies of carefully using signs so as to minimize their intrusion upon the area's natural and historic setting. . . . The decision not to post warning signs in remote areas of a national monument inherently requires a balancing of public policy objectives, such as resource allocation, visitor safety and scenic preservation." (brackets and internal quotation marks omitted)); *Johnson v. United States*, 949 F.2d 332, 338 (10th Cir. 1991) ("[T]he Park Service's decision not to place additional warnings in the Teton Range, whether explicit or implicit, was part of the overall policy decision to limit governmental regulation of climbing, educate climbers via the permit system, and preserve the Park in accordance with the statutory directive. . . . In the absence of facts indicating the failure to post additional warnings was a distinct, nonpolicy decision, we conclude that Plaintiff's failure to warn claim is barred by the discretionary function exception."); *Zumwalt v. United States*, 928 F.2d 951, 955 (10th Cir. 1991) ("[T]he absence of warning signs was part of the overall policy decision to maintain the Trail in its wilderness state. . . . The Park Service, in choosing to mark the Trail and place warnings in a corresponding pamphlet,

18

undertook a balancing of social, economic, and political policies. Therefore, the exercise of discretion in determining what safety measures to implement also is shielded from judicial review by the discretionary function exception.").

Examining these fact-specific cases, we discern three basic principles that have guided our analysis:

- If the decision not to give a warning flows from a broader policy decision concerning design or maintenance, then the failure to warn may be viewed as a policy-based exercise of discretion, *see Johnson*, 949 F.2d at 338; *Zumwalt*, 928 F.2d at 955 (decision not to post warning signs on trail was a "component of an overall policy decision" to "leave the Trail in its wild state"); *Weiss v. United States*, 889 F.2d 937, 940 (10th Cir. 1989) (decision not to warn aviators about tramway cable was part of discretionary policy choice not to treat objects less than 500 feet above the ground as an obstruction to aviation).

- Where the United States advances a policy of protecting the pristine quality of a wilderness area it owns or administers as a justification for failure to warn or to implement safety measures, this court will not simply assume that this represents a valid policy judgment without examining the factual context. *Compare Duke*, 131 F.3d at 1412 (government failed to show how failure to provide warning concerning boulder rolling down man-made slope "implicated political, social, or economic decisions of the sort that the exception was designed to

protect." (internal quotation marks omitted)) *with Elder*, 312 F.3d at 1183 ("The Middle Emerald Pools is not a parking lot, but a scenic attraction.").

- Where the United States has provided *some* warnings, it is more appropriate to view the failure to provide additional warnings as a policy-based decision than in cases where the government has failed to provide any warning at all. *Compare, e.g.*, *Zumwalt*, 928 F.2d at 955 ("The Park Service, in choosing to mark the Trail and place warnings in a corresponding pamphlet, undertook a balancing of social, economic, and political policies.") *with Smith*, 546 F.2d at 877 ("[W]e are convinced that the Government's decision, as a landowner, not to warn of the known dangers or to provide safeguards cannot rationally be deemed the exercise of a discretionary function.").

The Plaintiffs focus their attention on the second consideration cited above, contending that the purpose of the Capulin area is "not to preserve the natural beauty of the area . . . but . . . to provide a safe recreational sledding area for the public." Aplt. Opening Br. at 32. The government disputes this, arguing that "Capulin is classed as moderate to high in natural beauty" and that aesthetic factors involving preservation of the environment played a part in its design. Aplee. Br. at 47. As the government also observes, many of the hazards here, while in a sense man-made, are also the sort visitors would face in an untouched natural setting if they used hillsides for sledding, such as prevailed before the Capulin area was constructed.

20

In our view, however, it is the third consideration that is dispositive here. The Forest Service did not entirely fail to warn the public of known hazards associated with Capulin. Instead, it chose to provide warnings through signs and flyers that notified the public that Capulin was not supervised; that the public should use the area at its own discretion and risk; and that sledders should be considerate of others and should look before starting down the hill. The decision to provide this level of warning was subject to policy-based considerations including allocation of resources and maintaining the rustic nature of the Capulin snow play area.

The Plaintiffs argue for more specific warnings of specific hazards, placed on more visible signs. They complain that

> [t]he signs posted at Capulin . . . [lent] no warning as to the dangerous nature of the slope caused by the too steep grade, improper maintenance, and lack of supervision. The signs in no way alerted sledders that built-up ramps, ice, or the degree of the slope could lead to sleds losing control. *They failed to warn that sledding at Capulin could lead to serious injury or paralysis.*

Aplt. Opening Br. at 26 (emphasis added).

Although it might be appropriate in certain settings to require the warnings the Plaintiffs mention, the Forest Service was required to consider its limited resources and its mission to provide recreational activities "in close harmony with the surrounding environment." FSM 2300(4), Aplee. Supp. App. at 88. Posting large signs in unmistakable lettering enumerating specific deficiencies and hazards of the snow play area and referring to "serious injury or paralysis" could reasonably have been judged to detract from this objective. The United States has convincingly

21

argued that the level of warnings provided involved a policy-based decision shielded by the discretionary function exception.

## CONCLUSION

We affirm the district court's judgment and its order denying reconsideration of that judgment.

Entered for the Court


Gregory A. Phillips
Circuit Judge

22